STATE of Wisconsin, Plaintiff-Respondent,

v.

Anthony BALISTRERI, Defendant-Appellant.

Supreme Court

*No. 80–1156–CR. Argued March 4, 1982.—Decided March 30, 1982.*

(Also reported in 317 N.W.2d 493.)

742

For the defendant-appellant there was a brief by *Clifford R. Steele* and *Geraghty, Steele & Burke* of Milwaukee, and oral argument by *Clifford R. Steele*.

For the plaintiff-respondent the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

STEINMETZ, J.    The issues in this case are:

(1)  Did the trial court properly limit the cross-examination of a prosecution witness, Robert Roe, concerning the commission of prior crimes?

(2) Did the trial court properly instruct the jury that it could find the defendant guilty as a party to the crime of manslaughter/self-defense on the basis of the evidence adduced at trial?

We accepted this appeal on certification from the court of appeals.

The individual versions of the facts leading up to the offense are bizarre and varied when considering the number of witnesses who testified at the trial. The jury had to search for the truth, whatever the truth was as found by them. In doing this the jury found the defendant, Anthony Balistreri, guilty of a violation of secs. 940.05 (2) and 939.05, Stats.,[1] as a party to the crime of man-

---

[1] "940.05 **Manslaughter.** Whoever causes the death of another human being under any of the following circumstances is guilty of a Class C felony:

". . .

"(2) Unnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony; or . . ."

"939.05 **Parties to crime.** (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

"(2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime; or

"(b) Intentionally aids and abets the commission of it; or

"(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his mind and no longer desires that the crime be committed and notifies the other parties concerned of his withdrawal within a reasonable time before the

slaughter, imperfect self-defense. The jury also found the defendant not guilty as a party to the crime of first degree murder and not guilty as a party to the crime of second degree murder.

The offense arises out of the shooting death of Michael Trapp outside of a house on Milwaukee's west side.

The defendant relies on the following facts on this appeal: on December 16, 1978, the defendant attended a party at the house of Tim Delaney. About midnight, Michael Trapp, who was not at the party, told Jay Delaney on the telephone that he (Trapp) was on his way to the Delaney home to either collect a $5,000 drug debt from Tim Delaney or "blow his head off." Tim Delaney asked the defendant, Jay and another person to leave the house and stated that he would calm Trapp down and then all could return to the party.

The defendant asked Delaney whether Trapp would bring guns to the meeting, and Delaney stated Trapp had never brought guns in the past.

The defendant went home and called Robert Roe and the Casberg brothers, Kevin and Carl, to his home so they could return to Delaneys' house. The defendant testified he told them not to bring guns. However, Roe testified the defendant told him specifically to bring a .357 magnum and a shotgun along, which, pursuant to the defendant's request, he did.

The defendant testified that when he learned of Roe's bringing guns, he told Roe to return them to Roe's car. Instead, the guns were brought along in the defendant's car.

On the way to Delaneys' house, Roe brought out the magnum. The defendant testified that he tried to snatch it away from Roe without success. Roe stated it only had two shells in it so that it was almost harmless.

commission of the crime so as to allow the others also to withdraw."

The shotgun was on the rear seat of the defendant's car where the Casberg brothers were located.

When the defendant and cohorts arrived at Delaneys' home, they all remained in the car. Two persons, one identified as Pete and one named John Johnson, came to the car from the Delaney house and informed the defendant and others in the car that Michael Trapp was in the Delaney house armed with two guns and holding four people hostage.

Pete and John Johnson then went back and forth between the Delaney house and the car several times telling the defendant that everything was all right in the house and that he should leave. On each such trip, the defendant would drive his car away, travel around the block and return to stop in the front of Delaneys' house. This series of events was repeated three or four times, and each time the defendant stopped in front of Delaneys' house.

Finally, John Johnson exited the house, came to the defendant's car, entered it, and sat on the front passenger's seat. The defendant was at all relevant times in the driver seat, and Roe was between the defendant and Johnson. When Johnson entered the car he was armed with a modified, semi-automatic .32 pistol. The modification was to make it fully automatic.

Michael Trapp then exited the house with Tim Delaney. Trapp approached the car and had a .44 magnum revolver in either his belt or his hand, depending on the testimony believed.

According to testimony of the defendant, Tim Delaney and the Casbergs, Trapp pulled his gun from his belt and pointed it inside the front passenger window and said: "I'm going to blow your ———— head off." Johnson grabbed Trapp's gun and there was a struggle between them. There was then a loud discharge, "like a cannon," and a flash from Trapp's gun. After that, there was a

series of rapid, softer shots apparently from Johnson's gun. The .357 magnum was fired, but the testimony conflicted as to who fired it. Roe stated the defendant fired the gun, whereas the defendant stated Roe fired the gun. Tim Delaney and the Casbergs testified that the shot came from the middle of the front seat, since they saw the flash at that location. Roe stated he didn't hold or shoot the gun at that time.

The state's principal witness, Robert Roe, stated Trapp did not pull out a gun as he approached the window of the car. This was corroborated by Michael Blake, an associate of Trapp, and Delores Landers, the only independent, uninvolved witness who had watched the events from the window of a neighboring house.

After the shooting, the defendant drove away and then came back, allegedly to see who was shot. Michael Trapp was on his back on the pavement in the street with the .44 weapon in his hand. Investigation later showed there was one expended shell in the chamber of Trapp's weapon. An autopsy revealed that Trapp had .20% alcohol and an undetermined amount of cocaine in his blood.

In addition to the foregoing facts selectively relied on by the defendant, the following was known by the jury. Michael Blake had viewed the events of the shooting while he stood in the front window of the Delaney residence. Roe testified that the defendant called him and advised him to bring his magnum revolver and shotgun because there was a "war" ensuing with drug rival Michael Trapp whom the defendant had previously threatened. Also, Roe testified that on Johnson's last trip to the Delaney house, the defendant told Johnson to get his gun, which Johnson did prior to returning to the car. On the final trip around the block, according to Roe, the defendant and Johnson discussed killing Michael Trapp. Roe testified that the defendant stated: "I'm go-

ing to kill that bastard," and that Johnson replied: "Let me shoot him, I never miss. It's all arranged."

Roe then testified to the following series of events. As Trapp approached the car, Roe observed a revolver tucked in Trapp's trousers, but Trapp's hands were empty. The .357 magnum revolver was laying at the defendant's feet on the transmission hump, and Johnson had the .32-caliber pistol in his hand. As Trapp leaned over slightly, he placed his hand on the outside of the car near the open passenger window where John Johnson was sitting. The defendant then took the .357 magnum revolver, leaned over and fired once at Trapp who was standing outside the car. Immediately thereafter, Johnson fired five or six shots from his automatic pistol at point blank range at the victim, Michael Trapp. After the shooting the defendant told Roe to advise the police, if questioned, that the shooting of Trapp was in self-defense and that Trapp had come out of the Delaney residence waving a gun. The defendant also told Roe that Trapp's drug customers had no supplier now and that he (the defendant) "could walk right into that."

Michael Blake, a confederate of Trapp, corroborated Robert Roe's testimony in part. Blake testified Johnson informed him, after one of the visits to the defendant's car, that "Trapp was not leaving alive." Blake watched Trapp and Delaney walk to defendant's car; he observed that Trapp had a gun in the belt of his trousers, but that Trapp did not remove the gun as he approached the car. He saw Trapp lean in the front window on the passenger's side; there appeared to be a brief struggle, and then a shot was discharged from the "center of [the] front seat" followed by four or five rapidly fired shots from inside the car. Blake saw Trapp pull out his revolver after the first shot was fired and saw it discharge in the air as Trapp fell.

Delores Landers, who lived next door to the Delaney residence, was sitting at her front window for some time prior to and at the time of the shooting. She was armed with a pistol and had a pair of binoculars. She stated she occupied that defensive position because the neighborhood had been repeatedly terrorized during the preceding six months. Delores Landers testified concerning the sequence of events leading up to the shooting of Michael Trapp. She confirmed that Trapp was not carrying a revolver in his hand as he approached the car and that Trapp neither removed a revolver from his belt nor thrust it into the window of defendant's car before the shots were fired.

David Loosemore, who did not witness the shooting events, testified that he loaned a .357 magnum revolver to the defendant in November, 1978. The defendant called Loosemore on December 17, 1978, and informed him that Trapp was dead and that "his competition was gone and the market was now." The defendant told Loosemore that the .357 magnum revolver "blew big holes" and asked Loosemore if he could re-bore the revolver and provide 500 shells for him. Loosemore also testified that the defendant called him around the end of December, 1978, and asked Loosemore to tell the police that Robert Roe came to his (Loosemore's) house and forcibly removed the .357 magnum revolver.

The defendant had given three prior statements to the police which were inconsistent on a number of critical points. In his first statement, the defendant told the police that Trapp's gun was fired into his car and that John Johnson shot Trapp in self-defense. There was no mention that Robert Roe fired his revolver at Trapp. The defendant also gave inconsistent statements as to what gun, if any, he observed Roe fire.

The witnesses who corroborated in general detail the defendant's version of the events leading up to the shoot-

ing of Michael Trapp were Tim Delaney, Carl Casberg and Kevin Casberg. However, each of these witnesses was impeached by prior statements given to the police. Tim Delaney denied at trial that he ever dealt in drugs with the defendant. Detective Kenneth Hanke testified that Delaney told him during an interview on December 18, 1978, that he (Delaney) had made several drug deals with the defendant in recent months in order to repay a debt which he owed to Trapp.

Kevin Casberg testified at trial that Robert Roe fired the .357 magnum revolver at Michael Trapp. Detective Hanke testified that on May 30, 1979, Kevin Casberg told him that he didn't actually see who fired the .357 magnum revolver but that from "the angle where he [saw] the flash, it must have been Tony Balistreri." Detective Roman Blazer testified that Kevin Casberg advised him in a January 11, 1979, interview that the defendant had told him to lie to the police and state that Johnson shot Trapp in self-defense. Detective Blazer also stated that Carl Casberg told him during a January 19, 1979, interview that the defendant urged him to lie to the police which is why he had earlier told the police that Trapp had fired his gun into the car.

The prosecutor made a motion *in limine* prior to trial to restrict the cross-examination of defense witness Robert Roe concerning his involvement in prior criminal acts occurring on December 8, 1978, and December 16, 1978, which involved the use of the .357 magnum revolver used in the Trapp shooting.

The prosecutor advised the trial court that on December 8, 1978, Robert Roe went to an apartment, allegedly to collect a drug debt for the defendant, sexually assaulted a woman inside, and burglarized the apartment. On December 16, 1978, Robert Roe once again went to a residence to collect a drug debt for the defendant. Roe be-

came involved in a struggle with the occupant, and the occupant was shot and wounded.

The prosecutor argued that under secs. 904.04[2] and 906.08, Stats.,[3] the defense should not be allowed to in-

---

[2] "904.04 **Character evidence not admissible to prove conduct; exceptions; other crimes.** (1) CHARACTER EVIDENCE GENERALLY. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

"(a) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

"(b) *Character of victim.* Except as provided in s. 972.11(2), evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

"(c) *Character of witness.* Evidence of the character of a witness, as provided in ss. 906.07, 906.08, and 906.09.

"(2) OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[3] "906.08 **Evidence of character and conduct of witness.** (1) OPINION AND REPUTATION EVIDENCE OF CHARACTER. Except as provided in s. 972.11(2), the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to these limitations: a) the evidence may refer only to character for truthfulness or untruthfulness, and b), except with respect to an accused who testifies in his or her own behalf, evidence of truthful character is admissible only after the character of the witness or truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(2) SPECIFIC INSTANCES OF CONDUCT. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crimes as provided in s. 906.09, may not be proved by extrinsic evidence.

quire into the specific details of these prior instances of criminal misconduct which were not related to the shooting of Michael Trapp. Defense counsel argued that Roe's prior criminal acts on December 8, 1978, and December 16, 1978, were admissible to show motive, plan and identity.

The trial court ruled that the prior instances of criminal misconduct by Roe on December 8, and December 16, 1978, were not relevant to prove any of the elements specified in sec. 904.04(2), Stats., and that their admission would violate the rule that evidence of other crimes cannot be introduced to prove a person's disposition to commit criminal acts. The trial court also ruled that testimony of prior criminal activity by Robert Roe could be introduced insofar as it related to reduced charges or any other consideration which Roe received from the state.

In *Pointer v. Texas,* 380 US 400 (1965), the supreme court held that the sixth amendment right of confrontation includes the opportunity to cross-examine and applies to state proceedings as well as to the federal courts.

In *State v. Lenarchick,* 74 Wis. 2d 425, 441, 247 N.W. 2d 80 (1976), we held, "an opportunity for a cross-examination that has some meaning in the fact-finding process is necessary."

We stated in *State v. Gresens,* 40 Wis. 2d 179, 186, 161 N.W.2d 245 (1968): "The defense has a right to

They may, however, subject to s. 972.11(2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

"(3) TESTIMONY BY ACCUSED OR OTHER WITNESSES. The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility."

know the basis for the immunity; what other promises were made, if any; and whether the witness has been influenced or coached by the prosecution."

Both *Lenarchick* and *Gresens* emphasized that a defendant, through cross-examination, has the right to bring out the motives of state witnesses. This permits an avenue of questioning broader than simply whether or not the state has made specific promises.

This court quoted with approval the rule formulated in *Whitton v. State,* 479 P2d 302 (Alaska 1970), in *Lenarchick, supra,* at 447, as follows:

" 'The fact that what is brought out, either on cross-examination or by extrinsic evidence, may tend to prove that the witness committed wrongful acts, does not make this method of showing bias impermissible. To show bias is indeed a form of impeachment. But the objective here is not to attack credibility on the theory that the witness, because he has committed wrongful acts, is not likely to be truthful. The main objective is to show that the witness may have expected leniency or immunity from prosecution if he gave testimony in favor of the state, and it is necessary to show the commission of wrongful acts in order to establish the basis for such an expectation.' "

In *Lenarchick,* the offer of proof showed, in regard to the state's witness, that one charge had been dropped and two charges were being held open. The court stated at 447–48:

"When a witness has been criminally charged by the state, he is subject to the coercive power of the state and can also be the object of its leniency. The witness is aware of that fact, and it may well influence his testimony. A defendant, as an ingredient of meaningful cross-examination, must have the right to explore the subjective motives for the witness' testimony."

In the instant case, Robert Roe testified on direct examination that he was arrested by the police for criminal acts committed prior to the shooting of Michael Trapp and that he was charged in an information with one count of attempted murder, three counts of first degree sexual assault and two counts of armed robbery. Roe admitted that these crimes were committed in December, 1978, just prior to the December 17, 1978, Trapp incident. Roe also testified that he entered a plea of no contest to injury by conduct regardless of life, no contest to second degree sexual assault, and guilty to armed robbery. Roe stated he faced a maximum sentence of 40 years and the district attorney's office would recommend a term of incarceration.

On cross-examination, defense counsel explored in detail Roe's possible motive for testifying against the defendant. Roe admitted his negotiated plea reduced his potential sentence from 105 years to 40 years, that final sentencing was delayed until he testified at defendant's trial, and that after he agreed to testify, his $100,-000 cash bail was changed to a personal recognizance bond.

With all this information before the jury, they were able to properly assess Roe's motives and expectations for testifying against the defendant. The factual details of Roe's prior criminal acts were not relevant to the question of the witness's expectation of leniency from the state. In this case, the jury was advised of the nature and number of prior criminal acts committed by the witness Roe, the original crimes charged and filed by the state, and the results of plea negotiations with the state.

The defendant concedes on appeal that specific evidence relating to the December 8, 1978, sexual assaults

committed by Roe were properly excluded by the trial court. However, the defendant argues that he should have been allowed to cross-examine Roe concerning the factual details of the December 16, 1978, shooting incident which resulted in the witness's plea to a charge of injury by conduct regardless of life. The defendant argued at trial that it was Roe, and not the defendant, who fired the .357 magnum revolver at Michael Trapp. The defendant offered to prove that Roe was in the habit of carrying a gun, that he used the gun at the slightest provocation, and that his use of the .357 magnum revolver in an earlier shooting which occurred on December 16, 1978, was admissible to show motive, plan, intent and identity with respect to the shooting of Michael Trapp on December 17, 1978. Sec. 904.04(2), Stats.

The defendant was able to present to the jury the facts that Roe had access to the .357 magnum revolver and that he routinely carried it with him about once a week. Roe admitted that he checked the .357 magnum revolver, prior to the Trapp shooting and determined that there were two live shells in the revolver, conceding that the other four shells had been previously fired.

In addition Detective Gary Grundy was called by the defense and testified that Roe had a revolver in his possession when he was arrested. Defense witness, William Edwards, testified that he had occasion to meet Robert Roe four times and that at each meeting Roe was carrying a .357 magnum revolver. Defense witness Roy Federman testified he had a holster sewn into Roe's coat for his favorite revolver nicknamed "Maggie."

The defendant wanted to be allowed to cross-examine Roe on the details of the previous shooting incident of December 16, 1978, in order to demonstrate and establish motive, plan, intent or identity on Roe's part in the

Michael Trapp shooting. The trial court ruled that this evidence was not relevant, and we sustain that ruling as being within the trial court's discretion. *Barrera v. State,* 99 Wis. 2d 269, 279, 298 N.W.2d 820 (1980).

Identity was not an issue at defendant's trial. All parties in the car at the time of the shooting were consistently identified by all witnesses. The identity of the person who shot the revolver at the scene of this crime was testified to by all living parties present and that testimony was in conflict. The jury also knew Roe had been charged with firing a gun earlier that day and injuring someone.

Neither was intent an issue. There was no question, on the basis of all the testimony offered, that the shooting of Michael Trapp was intentional. The only issue was whether the shooting was premeditated, imminently dangerous and evincing a depraved mind or was an act of self-defense. If the defendant's version is accepted, Roe's intent in firing the gun was supplied by the defendant himself: Michael Trapp had thrust a revolver into the car and threatened to shoot the occupants, and Roe fired the revolver in self-defense. If Roe's version of the shooting was accepted, Roe's intent is not an issue, because Roe testified that the defendant fired the .357 magnum revolver at Trapp.

Motive and plan are closely related concepts. Motive explains the reason for a person's actions, and plan explains the deliberate steps taken by the person to accomplish the purpose. This court defined "plan" as used in sec. 904.04(2), Stats., in *State v. Spraggin,* 77 Wis. 2d 89, 99, 252 N.W.2d 94 (1977):

"The word 'plan' in sec. 904.04(2) means a design or scheme formed to accomplish some particular purpose. . . . Evidence showing a plan establishes a definite prior design, plan, or scheme which includes the doing of the act charged. As Wigmore states, there must be 'such a

concurrence of common features that the various acts are materially to be explained as caused by a general plan of which they are the individual manifestations.' "

*See also, Haskins v. State,* 97 Wis. 2d 408, 412–13, 294 N.W.2d 25 (1980).

There was no evidence offered by defendant making a relevant connecting link between the shooting by Roe earlier on December 16, 1978, and the shooting of Michael Trapp that same evening. There was nothing to indicate that the earlier shooting was a step in a plan leading to the shooting of Michael Trapp.

The defendant did argue to the jury that it was more likely that Roe, rather than the defendant, fired the .357 magnum revolver at Trapp, because Roe frequently carried the revolver and because Roe was a violent person.

The trial court did not abuse its discretion when it prevented the defendant from eliciting testimony on the factual details of the earlier December 16, 1978, shooting in order to make the identical argument that it was more likely that Roe shot Trapp because he was prone to violence, as evidenced by the fact that he previously shot another person with the .357 magnum revolver in an unrelated incident. Evidence of other crimes is not to be admitted merely to show that a person acted in conformity with a general criminal disposition to violence. We, therefore, conclude that the trial court's limitation of the defendant's cross-examination of Robert Roe was proper and did not constitute an abuse of discretion.

The second issue on this appeal is whether a person may be convicted as a party to the crime of manslaughter where a person is killed unnecessarily in the exercise of the privilege of self-defense. Sec. 940.05(2), Stats.

It is well established that a person may be convicted as a party to a crime different than the crime which was

originally intended by the parties. *Hawpetoss v. State,* 52 Wis. 71, 80, 187 N.W.2d 823 (1971) and *State v. Cydzik,* 60 Wis. 2d 683, 696–99, 211 N.W.2d 421 (1973).

In *State v. Asfoor,* 75 Wis. 2d 411, 427–29, 249 N.W. 2d 529 (1977), the court referred to earlier interpretations of sec. 939.05, Stats., as follows:

"The elements of aiding and abetting are that a person:
" '(1) [U]ndertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further (2) he consciously desires or intends that his conduct will yield such assistance.' *Hawpetoss v. State,* 52 Wis. 2d 71, 78, 187 N.W.2d 823, 826 (1971) ; *State v. Nutley,* 24 Wis. 2d 527, 555, 129 N.W.2d 155, 157 (1964), *cert. denied,* 380 U.S. 918.

"The defendant makes two arguments relating to this charge. The first is that the intent of the aiding and abetting section of the party to a crime statute must be specific intent. The second is that the crime of injury by negligent use of a weapon by aiding and abetting is unknown to the law.

"The essence of the first argument is that an aider and abettor cannot be guilty unless it is shown that the crime which was committed was the specific crime which the aider or abettor intended be committed. This argument is refuted by *State v. Cydzik,* 60 Wis. 2d 683, 211 N.W.2d 421 (1973). Cydzik, argued that he could not be guilty of aiding and abetting first degree murder because ' "[e]very act, every move that [he] made that evening was connected to the robbery, and not to the murder." ' *Id.* at 696, 211 N.W.2d 429. This court recognized that in a limited and literal concept of intending it was true that there was only intent to participate in the robbery. But it also recognized that one who drives a getaway car in an armed robbery is presumed to intend the natural consequences of his act. Cydzik began his participation intending an armed robbery, but was held to intend the murder which occurred during the robbery. His overt acts demonstrated that he was willing to assist in the robbery and whatever it entailed. He intended the murder and was responsible as an aider and abettor. The

same can be said of Asfoor. He intended his acts; knowing his friends' plans to do 'hostile damage' to the victim, he voluntarily drove the car to the Holiday Inn. His acts demonstrated that if assistance became necessary in the commission of a crime he was ready to provide it. In fact, he did provide assistance by allowing the use of one of his guns and by driving Schubert and Jewell to the motel. Without his assistance the crime could not have taken place. When he set out he aided his companions and must be held responsible for the natural consequences of his act. Using the metaphor of this court in *Cydzik*, Asfoor was not 'sitting on the bench. . . . He was in the game, . . . playing a position or performing a function as to the commission' of the crime. *Id.* at 699, 211 N.W.2d 430.

"It is also argued that it is impossible to intend the crime of negligent injury by use of a weapon. It is true that intent and negligence are mutually exclusive and one cannot intend to injure someone by negligent conduct. However, there are often many intentional acts which lead to an injury caused by negligence. For example, the negligent driver of a car involved in a head-on collision intended to drive his automobile. He also intended to pass the slow moving vehicle in front of him, but he did not intend to hit the oncoming car. His intentional acts would not prevent him from being found negligent if he failed to exercise proper lookout or was driving too fast. The same is true of Asfoor. He consciously agreed to aid his companions when he knew they were planning a crime. He took overt actions to further their conduct. He intended to place the handgun on the floorboard of the car. He was conscious that the shotgun was in the back seat. He in fact did intentionally aid and abet the actions of his companions. All these intentional acts led to an injury when one of those he aided acted negligently while using a weapon. Asfoor, like Cydzik, is responsible for the natural consequences of his acts. He intended to participate in the manner he did and these acts aided and abetted."

The defendant argues that the decisions in *Asfoor* and *Cydzik* can be distinguished, since in each of those cases

the defendants admitted they intended to commit *a* crime, though an accomplice committed a crime different than the one originally intended. The defendant points out that he testified he went to the Delaney residence without any intent to commit a crime and the shooting of Michael Trapp was the result of the spontaneous acts of accomplices Roe and Johnson. That argument ignores the testimony of Robert Roe. The jury could have reasonably found that: (1) the defendant intended to confront Trapp with a body of armed men; and (2) the defendant, when he arrived at Delaneys' residence, conspired with John Johnson to intentionally shoot Trapp. The evidence showed that the defendant intended to commit *a* crime, and that under these circumstances, the unnecessary killing of Trapp by firing six or seven shots at point blank range as an act of self-defense was a natural and probable consequence of the conspiracy entered into by the defendant.

The defendant also argues that he should not be convicted as a party to the crime of manslaughter/self-defense because of "the uniquely subjective character of the privilege of self-defense." Sec. 940.05(2), Stats., and the standard jury instruction, Wis. J I—Criminal 1140, provides that a homicide is manslaughter if a reasonable person would not have believed that he was privileged to use force or that it was not reasonable to use as much force as was employed. The use of the reasonableness standard for conviction under the manslaughter statute is the same, from an analytical point of view, as the negligence standard used in sec. 940.24 for conviction of injury by negligent use of a weapon. We ruled in *Asfoor* that a person could be convicted as a party to the crime of injury by negligent use of a weapon. Similarly, in the present case, the trial court properly instructed the jury

that it could convict the defendant as a party to the crime of manslaughter/self-defense.

The evidence showed that the defendant knew that Michael Trapp was armed with a revolver and was supported by at least one armed guard. The evidence also showed that the defendant deliberately confronted Trapp with a group of men who were armed with two revolvers and a shotgun. There was also evidence that the defendant entered into a conspiracy with Johnson to shoot Trapp. The defendant testified he was sitting in the driver's seat in his car when he saw Trapp exit the Delaney residence carrying a gun. The defendant's car was in the middle of the street with its engine running. The defendant could have driven away and avoided the confrontation, but did not. Under the circumstances of this case, as in *Asfoor,* the subjective intent of defendant's accomplice in shooting Trapp was a natural and probable consequence of the conspiracy entered into by the parties.

The defendant argues that there was no evidence to support a verdict that the defendant killed Michael Trapp by using excessive force in the exercise of the privilege of self-defense. The defendant theorizes that the jury, in rejecting verdicts of first and second degree murder, necessarily rejected Roe's testimony that defendant did the shooting and adopted the theory that Roe and Johnson simultaneously shot Trapp in self-defense. The defendant concludes that if the jury believed Roe's testimony that a conspiracy existed, it should have convicted the defendant of first degree murder; if the jury believed that Roe and Johnson shot Trapp unnecessarily in self-defense, it should have acquitted the defendant.

The testimony of Roe consists of three important elements: (1) that the defendant conspired to kill Trapp

and deliberately confronted Trapp at the Delaney residence with a carload of armed men; (2) that the defendant fired the .357 magnum revolver at Trapp; and (3) that the single shot fired by the defendant and the five or six shots fired by Johnson were not acts of self-defense because Trapp did not draw his revolver and thrust it into the open window of defendant's car.

The jury could have reasonably concluded, on the basis of all the evidence presented at the trial, that the defendant conspired to kill Trapp and deliberately confronted him with a group of armed men at the Delaney residence. However, the jury could also have concluded that the provocative conduct of Trapp in drawing a weapon on Johnson and Delaney inside the residence and coming to the defendant's car armed with a .44 magnum revolver, raised a reasonable issue of self-defense, notwithstanding the defendant's previously formed intent to kill.

The jury was not required to accept or reject Roe's testimony in its entirety. Such a proposition was specifically rejected by this court in *Nabbefeld v. State,* 83 Wis. 2d 515, 529, 266 N.W.2d 292 (1978). The two essential elements of Roe's testimony the jury had to accept in order to find the defendant guilty as a party to the crime of manslaughter were that the defendant conspired to kill Trapp and deliberately confronted Trapp with a car of armed men at the Delaney residence. If the jury found that a conspiracy to kill existed, that Trapp engaged in some provocative action, and that the defendant or his co-conspirators fired six or seven shots into Trapp at point blank range in an unreasonable exercise of the privilege of self-defense, then the jury could have reasonably concluded that the defendant was guilty as a party to the crime of manslaughter/self-defense.

There was conflicting evidence and the choice was for the jury. In reviewing the sufficiency of the evidence, this court will not retry a criminal case on the facts of record. *Asfoor, supra,* at 434, *State v. Chacon,* 50 Wis. 2d 73, 74, 183 N.W.2d 84 (1971). The test on review is whether the jury acting reasonably could be so convinced. The record in this case sustains the jury's finding of the defendant's guilt of party to the crime of manslaughter/self-defense.

*By the Court.*—The judgment of the trial court is affirmed.