# COURT OF APPEALS
## DECISION
## DATED AND FILED

## March 17, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1696-CR**

Cir. Ct. No. **2014CF23**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

AHMED FARAH HIRSI,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for St. Croix County: JAMES M. PETERSON, Judge. *Reversed and cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Ahmed Hirsi appeals a judgment, entered upon a jury's verdict, convicting him of three counts of attempted first-degree intentional homicide, three counts of first-degree reckless injury, three counts of first-degree recklessly endangering safety, and one count of possession of a firearm by a felon.[1]   He also appeals an order denying him postconviction relief.   Hirsi contends that: (1) his due process rights were violated, for a number of reasons, by the circumstances surrounding the testimony of his co-defendant; (2) the circuit court improperly admitted certain other-acts evidence concerning a shooting in St. Paul, Minnesota, two days prior to the shooting for which Hirsi was tried in this case; (3) the court improperly admitted lay opinion testimony identifying Hirsi as the shooter in the St. Paul case; (4) the court's admission of expert testimony concerning the tendency of Somali individuals to distrust law enforcement and to fabricate events in order to avoid retribution within their community constituted plain error;[2] and (5) a new trial is warranted in the interest of justice because the real controversy was not fully tried.

¶2     We agree with Hirsi that certain portions the expert testimony concerning Somali culture violated *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984), and its progeny.   Further, we conclude that because the error in admitting the testimony was obvious, substantial and fundamental, a

---

[1] These convictions, with the exception of the possession of a firearm by a felon count, were as a party to the crime.   We note that the jury also returned guilty verdicts on three additional counts of first-degree recklessly endangering safety as a party to the crime.   The State conceded Hirsi's postconviction argument that those convictions constituted lesser-included offenses of the three attempted first-degree intentional homicide convictions, and the circuit court therefore vacated and dismissed them.

[2] It is undisputed that Hirsi, his co-defendant, and the six victims in this case are Somali.

2

new trial must be granted. Consequently, we reverse and remand for further proceedings consistent with this opinion.[3]

## BACKGROUND

¶3 The charges against Hirsi arose from a shooting that occurred at approximately 9:22 a.m. on January 19, 2014, in a Hudson, Wisconsin, liquor store parking lot. Witnesses to the shooting informed responding officers that an individual in the passenger seat of a tan Cadillac—which had since fled the scene—fired multiple gunshots into a Kia sport utility vehicle. Bullets struck three of the Kia's six occupants (Aaden, Magan, and Faduma) while the other three (Maxamed, Sahra, and Faarax) were unharmed.[4]

¶4 Later that morning, a law enforcement officer in Eagan, Minnesota, located a vehicle that matched the description of the Cadillac involved in the Hudson shooting. The two occupants of that vehicle were subsequently arrested and identified as Hirsi and his co-defendant, Guled Abdi.

¶5 Hirsi represented himself at trial with the aid of standby counsel. The State's theory of the case was that Hirsi and Abdi were talking to the

---

[3] Because we reverse on the grounds that the admission of the expert testimony concerning Somali culture constituted plain error, it is not strictly necessary for us to address the remaining arguments Hirsi raises on appeal. *See* ***Turner v. Taylor***, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (when one issue is dispositive, we need not reach the other issues raised). Nonetheless, we choose to address Hirsi's arguments related to the St. Paul shooting, as they are likely to arise again in future proceedings. We decline to address Hirsi's remaining arguments.

[4] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2017-18), we use pseudonyms to identify the victims.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

occupants of the Kia when Hirsi (seated in the Cadillac's passenger seat) recognized Faduma and called her a "nyah"—which is a derogatory term in the Somali language. Faduma responded in kind, after which Hirsi began to shoot indiscriminately into the Kia.

¶6 Hirsi's defense strategy was to deny any involvement in the Hudson shooting. To that end, he told the jury that "the State will not be able to beyond a reasonable doubt prove that I was the person in any way who in fact was in the city of—in the city of Hudson" on the day of the shooting. He continued pursuing this theory of defense throughout trial, and he argued in closing that there were "two people in [the] Cadillac, and neither one was I."

¶7 Abdi provided the sole testimony identifying Hirsi as the shooter.[5] Specifically, he testified that Hirsi was sitting in the passenger seat of Abdi's car when, after exchanging insults with Faduma, Hirsi "stiff-armed me in my face, like football players do, reach[ed] over me, pulled out a handgun out of nowhere and started shooting." After the shooting, Abdi stated that Hirsi "put the gun up to my head and said, 'Drive, mother fucker, or you're next.'"

¶8 Faduma testified that she was in the Kia prior to the shooting and that she recalled a car with two individuals pulling alongside the Kia and talking to the occupants of the Kia. She denied knowing either of the two individuals in the

---

[5] Abdi was originally charged in St. Croix County case No. 2014CF22 with the same crimes with which Hirsi was charged in this case. It is undisputed that the State and Abdi subsequently reached a plea agreement, under which Abdi agreed to plead guilty to two felony charges and to provide truthful testimony at Hirsi's trial. In exchange, the State agreed to recommend that Abdi be sentenced to two years' incarceration. As indicated, we will not discuss the arguments Hirsi raises related to this agreement and Abdi's testimony, given our resolution of this appeal on other grounds.

car, and she further denied that anyone directed the derogatory term "nyah" at her—although she acknowledged that someone in the other car called "the other female" in the Kia (i.e., Sahra) that term. Faduma stated that "maybe an hour" after this name-calling occurred, the shooting took place.

¶9 Aaden, the driver of the Kia, testified that he saw the shooter and that it was not Hirsi. Moreover, when Hirsi directly asked Aaden whether he saw Hirsi at "the time of the shooting at Hudson," Aaden replied, "Nope." Aaden also testified that, prior to trial, he told law enforcement that "they had the wrong man in custody and that the man that shot me is out there and free."

¶10 The remaining four occupants of the Kia did not testify at trial. Still, testimony was introduced regarding three of those individuals' involvement in the course of law enforcement's investigation of the shooting. Namely, Peter Schultz, a detective sergeant with the Hudson Police Department, testified that he interviewed Sahra on the day of the shooting and that she could not identify the shooter. Geoff Willems, also a detective sergeant with the Hudson Police Department, testified that he attempted to interview Magan on the day of the shooting but that Magan "declined to make a statement." Finally, St. Croix County Sheriff's Department patrol sergeant Jeff Kennett testified that he attempted to interview Maxamed on the day of the shooting but that Maxamed was uncooperative.[6]

---

[6] Although no testimony was introduced regarding Faarax's involvement with the police investigation, a police report attached to the criminal complaint related that Faarax told police on the day of the shooting that he "did not know who did the shooting."

¶11    The State called detective Tracy Henry, a St. Paul, Minnesota, police officer, "as an expert to testify to certain aspects involving the Somalian culture and criminal justice system." Prior to her testimony, the circuit court confirmed with Hirsi that he had received notice of the general topics which Henry's proposed testimony would address, and that Hirsi did not object to her giving such testimony. Henry then provided the following relevant testimony:

> Q. And based upon your training and experience, how receptive are American Somalians or Somalian immigrants in America towards police officers, law enforcements and the courts?
>
> A. There is quite a bit of distrust in the community.
>
>  ….
>
> Q. And would it be consistent with your training and experience that victims of Somalian-on-Somalian crime would not want to involve law enforcement of the United States?
>
> A. Yes, that would be my experience.
>
> Q. And why is that?
>
> A. Oftentimes they—they don't trust the police or the courts to resolve things. And they would rather have it handled amongst themselves. …
>
> Q. And is there an aspect of it based upon your training and experience that victims are afraid of potential retaliation if they go to American law enforcement?
>
> A. Yes. Oftentimes there is retaliation from people within their clan for causing a dispute with another clan; or the other clan may cause—or, you know, retaliate against the victim also. There's been several instances where victims are afraid to come forward because they've been threatened. And oftentimes family members will just send them to other parts of the country or back to Somalia.
>
> Q. And do you have any statistics of—according to your knowledge that would support that claim?

6

A. Yes. In the Twin Cities there was over 20 homicides since about 2007, 2008. And only about—or less than five of them have been successfully prosecuted.

Q. Would these be—if you know, these 20 or so homicides, are these cases involving Somalian-on-Somalian crime?

A. Yes. I should have clarified. All 20 of them—or over 20 of them would be Somali on Somali.

*Q. And based upon your training and experience, would it be an accurate statement that victims or witnesses of Somalian-on-Somalian crime could have a tendency to fabricate certain events so as to avoid retribution within their community?*

*A. Yes.*

….

Q. And throughout your training and experience and the contact that you've had with respect to individuals of the Somalian community, are you able to give an opinion as to whether or not Somalians may be nervous or afraid to testify in a court proceeding such as this?

A. Yes. I believe they would be nervous to testify in this manner.

(Emphasis added.)

¶12    In its closing argument, the State told the jury that "this case really comes down to" a credibility determination. That is, did the jury believe Abdi's testimony that Hirsi was the shooter or the testimony from the Kia's occupants that either failed to identify Hirsi as the shooter or affirmatively stated he was not the shooter.

¶13    To support its argument that the jury should believe Abdi, the State specifically invoked Henry's testimony, stating

> *[Y]ou know that [Aaden] is not telling—telling the truth. And you heard from Tracy Henry why that might be with the Somalian community.* And another thing, we have six

7

> people shot at here, six persons. The good news is none actually died. Two of them made any kind of statements to the police, two out of six. That's a reflection of Tracy Henry's summary to you about the Somalian culture and their lack of cooperation with law enforcement.

(Emphasis added.) The State continued this line of argument later in its closing, again telling the jury that "[Aaden's] making it up, ladies and gentlemen. He's making it up to protect the Defendant. Why? I don't know why the cultural bias is that. But you heard the testimony of Tracy Henry about that."

¶14 The jury ultimately returned guilty verdicts on the counts referenced above. The circuit court imposed sentences totaling fifty years' initial confinement and thirty-five years' extended supervision.

¶15 Hirsi moved for postconviction relief, raising the same arguments he now makes on appeal. Following briefing and two hearings, the circuit court denied Hirsi's motion. Hirsi now appeals.

## DISCUSSION

¶16 We begin with Hirsi's argument that the admission of detective Henry's testimony concerning Somali culture constituted plain error. The plain error doctrine is codified in WIS. STAT. § 901.03(4). *See **State v. Jorgensen***, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. The doctrine allows appellate courts to review errors that were otherwise waived by a party's failure to object. *Id.* A plain error is an error that is so fundamental that a new trial or other relief must be granted despite the lack of an objection. *Id.* To warrant relief, the error must be obvious and substantial, and courts should use the plain error doctrine sparingly. *Id.* If the defendant shows that the unobjected-to error is fundamental,

obvious and substantial, the burden then shifts to the State to show the error was harmless. *Id.*, ¶23.

¶17    Hirsi's argument that the admission of Henry's testimony constituted plain error rests on his assertion that the testimony violated the *Haseltine* rule. That rule prohibits one witness from testifying about the truthfulness of another witness's testimony. *State v. Patterson*, 2010 WI 130, ¶58, 329 Wis. 2d 599, 790 N.W.2d 909. This prohibition exists because it is uniquely within the role of the factfinder—here, the jury—to act as "the lie detector in the courtroom." *Haseltine*, 120 Wis. 2d at 96.

¶18    Here, Hirsi asserts that Henry's testimony infringed upon the jury's role as the courtroom's "lie detector" because it provided a "general commentary about Somalian people being uncooperative with police, more likely to settle matters themselves, and having a 'tendency to fabricate' events." Moreover, he asserts that the testimony was "especially prejudicial" because it was based on race or ethnicity. Finally, he asserts that the "improper" testimony was "exemplified" by the State's reliance on it during closing argument to discredit the "witnesses favorable to Hirsi."

¶19    We generally agree with Hirsi's assertions. In particular, we agree with Hirsi that the State's elicitation of testimony that Somalis have a tendency to fabricate events constituted a *Haseltine* violation, and that the objectionable testimony was exacerbated by the State specifically invoking it in its closing argument. To explain, it is plain that Henry's testimony was elicited to impugn the credibility of the witnesses who either stated they could not identify Hirsi as the shooter or affirmatively stated he was not the shooter. Indeed, that is the exact purpose for which the State referenced Henry's testimony in its closing argument,

telling the jury that it should not believe Aaden's testimony that Hirsi was not the shooter because he was "making it up to protect the Defendant. Why? I don't know why the cultural bias is that. But you heard the testimony of Tracy Henry about that." Moreover, the State's framing of the issue shows that witness credibility was no small matter—in fact, the State told the jury that its credibility determination was what "this case really comes down to."

¶20 We also generally agree with Hirsi's argument that the racial and ethnic aspect of Henry's testimony raises heightened prejudice concerns, as such a notion is firmly supported by our case law. For example, in *State v. Burton*, 2007 WI App 237, ¶16, 306 Wis. 2d 403, 743 N.W.2d 152, we reversed a defendant's conviction based upon expert testimony the State introduced "to put a context on who some of [the trial witnesses] are we're dealing with … *why this culture* wants to cooperate with [law enforcement], why they don't, *why their stories are different on the street than when they hit a courtroom.*" *Id.*, ¶4 (emphases added). In doing so, we explained that such testimony is "unfairly prejudicial" and stated that we "see little, if any probative value in this sort of testimony." *Id.*, ¶17. Further, in explaining our "view of the low worth of such evidence," we noted:

> The possibilities of such testimony are almost endless—involving the characteristics and motivations of various *racial, ethnic*, professional, and religious groups, as well as organizations as different as the Boy Scouts and the Compton Crips. *The law has wisely looked askance at evidence of group tendencies and motives to lie—or tell the truth—when making credibility judgments about individual members of those groups.* The relevance of such group tendencies in predicting a witness's credibility on a given occasion is extraordinarily weak. Meantime the potential prejudice—in favor of certain groups and organizations and against others—is extraordinarily powerful.

*Id.*, ¶17 (emphases added).

10

¶21     Critically, the State wholly fails to defend the propriety of Henry's testimony on appeal.   Instead, its two-page argument concerning her testimony about Somali culture notes that Hirsi failed to object to the testimony at issue and makes a cursory assertion that "[t]his is not the rare case triggering plain-error review."   In support of that latter assertion, the State simply states that even though Hirsi represented himself at trial, he must still be held to the same standards as a reasonably competent attorney.  *See Waushara Cty. v. Graf*, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992).

¶22     The State's reliance on *Graf* is misplaced.   Whether Hirsi was represented by counsel at trial has no bearing on our analysis of a claim of plain error.  By definition, a plain error claim will always arise out of a party's failure to object to an error, whether represented by counsel or not.  As such, our case law directs us to focus on the nature of the error itself, rather than the performance of counsel or a self-represented party, to determine if the error was fundamental, obvious and substantial.  *See Jorgenson*, 310 Wis. 2d 138, ¶21.

¶23     Because the State completely fails to dispute the merits of Hirsi's assertion that the admission of Henry's testimony concerning Somali culture constituted plain error, we deem that point conceded.  *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).  Further, because the State fails to address Hirsi's argument that the racial and ethnic aspects of the testimony raise heightened concerns of prejudice that counsel in favor of granting a new trial—and in conjunction with the support in our case law for such a notion—we likewise deem that aspect of Hirsi's argument conceded.  *See id.*

11

¶24    The State's effective concession that plain error occurred in this case does not necessarily end our inquiry, as plain error does not necessitate relief if the State can meet its burden to show that the error was harmless. *See **Jorgenson***, 310 Wis. 2d 138, ¶21. Here, however, the State does not even attempt to develop a harmless error argument concerning Henry's testimony about Somali culture. This omission is especially troubling given that the first portion of our plain error analysis required a determination that the error was fundamental, obvious and substantial—which, again, we find to be the case. We need not address undeveloped arguments. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). In addition, we will not abandon our neutrality to develop arguments for a party. *See **Industrial Risk Insurers v. American Eng'g Testing, Inc.***, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 83. We therefore conclude that plain error occurred and that the error was not harmless, and we reverse for a new trial.

## II. Additional arguments

¶25    Hirsi also argues that the circuit court erroneously exercised its discretion by allowing the State to introduce certain other-acts evidence at trial. The decision to admit or exclude evidence, including other-acts evidence, is within a circuit court's discretion. ***State v. Hurley***, 2015 WI 35, ¶28, 361 Wis. 2d 529, 861 N.W.2d 174. We will uphold a court's admission of such evidence if the court examined the relevant facts, applied the proper standard of law, and used a demonstrated rational process to reach a conclusion that a reasonable judge could reach. ***Id.***

¶26    The other-acts evidence that Hirsi faults the circuit court for admitting related to a shooting in St. Paul, Minnesota, that occurred two days prior

to the Hudson shooting. Specifically, the State introduced evidence that: (1) a shooting occurred at an apartment in St. Paul on January 17, 2014; (2) surveillance photos depicted Hirsi at that apartment holding a gun; and (3) a bullet recovered from the St. Paul apartment shooting was fired from the same gun that fired the bullets in the Hudson shooting.

¶27 Hirsi first argues that the circuit court applied an improper standard of law when it concluded that the State offered evidence of the St. Paul shooting for a permissible purpose under WIS. STAT. § 904.04(2)(a).[7] That statute prohibits the admission of evidence of a defendant's bad acts to show that the defendant has a propensity to commit crimes. *Id.* At the same time, however, the statute recognizes that when other acts are "offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," the evidence may be admissible. *Id.*; *see also* **Hurley**, 361 Wis. 2d 529, ¶¶55-56.

¶28 Here, the circuit court concluded that evidence of the St. Paul shooting was offered to establish Hirsi's identity as the Hudson shooter. In arguing that this conclusion failed to apply the proper standard of law, Hirsi contends that "identity was never truly at issue" because multiple witnesses "placed Hirsi at the Hudson scene." Put differently, Hirsi argues that the jury knew that Hirsi and Abdi were in the Cadillac, and the only issue the jury needed to resolve was whether Abdi or Hirsi was the shooter. Based on this framing of

---

[7] We note that when considering the admissibility of other-acts evidence, courts are guided by the three-step "analytical framework" set forth in *State v. Sullivan*, 216 Wis.2d 768, 576 N.W.2d 30 (1998). *See State v. Payano*, 2009 WI 86, ¶¶58-60, 320 Wis. 2d 348, 768 N.W.2d 832. Here, because we limit our discussion of the other-acts evidence to issues that are likely to arise again in future proceedings, we do not perform a comprehensive *Sullivan* analysis.

the case, Hirsi argues that evidence of the St. Paul shooting should have been excluded pursuant to our supreme court's holding in *State v. Balistreri*, 106 Wis. 2d 741, 317 N.W.2d 493 (1982).

¶29 We are not persuaded that the circuit court erred in concluding that evidence of the St. Paul shooting was offered by the State for the proper purpose of proving Hirsi's identity as the Hudson shooter for two reasons. First, the record belies Hirsi's assertion that his defense strategy was to argue that he was in the car with Abdi, but not the shooter. Rather, in his opening statement, Hirsi told the jury that "the State will not be able to beyond a reasonable doubt prove that I was the person in any way who in fact was in the city of—in the city of Hudson" on the day of the shooting. Hirsi then pursued this theory of defense throughout the trial, including by eliciting Aaden's testimony that he did not see Hirsi at the scene of the shooting. Hirsi subsequently relied on Aaden's testimony in his closing argument when he told the jury that there were "two people in [the] Cadillac, and neither one was I."

¶30 Even assuming that Hirsi's theory of defense at trial was that he was in the Cadillac, but was not the shooter, we reject his "identity" argument because the case he relies on to support it, *Balistreri*, is distinguishable. In that case, Balistreri was tried for the shooting death of Michael Trapp. *Id.* at 744. Balistreri's defense at trial was that a third party, Robert Roe (who was in an automobile with Balistreri at the time of the shooting), fired the fatal shot, not Balistreri. *Id.* at 755.

¶31 To support his defense, Balistreri sought to cross-examine Roe on the details of a shooting that Roe had committed—using the same .357 revolver that was later used to shoot Trapp—the day before Trapp was killed. *Id.* Our

supreme court upheld the circuit court's decision to prohibit Balistreri from doing so. *Id.* at 755-56. The court explained that

> [i]dentity was not an issue at defendant's trial. All parties in the car at the time of the shooting were consistently identified by all witnesses. The identity of the person who shot the revolver at the scene of this crime was testified to by all living parties present and that testimony was in conflict.

*Id.* at 756.

¶32    Hirsi argues that because the "circumstances here are nearly identical" to *Balistreri*, the circuit court erred, as a matter of law, by concluding that the other acts the State introduced were relevant to proving Hirsi's identity as the shooter. But Hirsi ignores a critical fact that contributed to the court's decision in *Balistreri*—"[t]he defendant was able to present to the jury the facts that Roe had access to the .357 magnum revolver and that he routinely carried it with him about once a week." *Id.* at 755. As a result, the jury knew that the gun used in the shooting belonged to Roe, and admitting the details of the other shooting would have served no purpose beyond "merely [showing] that [Roe] acted in conformity with a general criminal disposition to violence." *Id.* at 757.

¶33    In this case, however, the State sought to introduce evidence of the St. Paul shooting to establish that Hirsi had previously possessed the very gun used in the Hudson shooting—which was a disputed issue at trial—not to show that Hirsi had a propensity to commit acts of violence. The probative value this evidence had toward establishing that Hirsi was the shooter was elevated by the fact that there was no evidence linking Abdi to the St. Paul shooting. Consequently, as the circuit court aptly noted in its decision to admit the other-acts evidence, "if a jury is satisfied that the bullets were the same and you're the same

15

person that fired the gun, that would tend to make it more likely, more probable that you were the shooter in the Hudson case." In other words, the evidence was properly offered to establish Hirsi's identity as the shooter in the instant case.

¶34    Hirsi next contends that the circuit court erred by admitting the other-acts evidence regarding the St. Paul shooting, but then refusing to admit the fact that Hirsi was acquitted at trial of the charges that arose from that incident.[8] He reasons that, although evidence of conduct for which a defendant has subsequently been acquitted may be deemed admissible other-acts evidence, "the dictates of both *Dowling*[9] and *Landrum*[10]" require that when a court admits such evidence it must also read to the jury a limiting instruction informing them about the acquittal.[11]

¶35    The problem with Hirsi's argument is that neither *Dowling* nor *Landrum* dictate that a court must read to a jury the type of limiting instruction Hirsi faults the circuit court for failing to read in this case. To be sure, in *Dowling v. United States*, 493 U.S. 342 (1990), the Supreme Court recognized that the

---

[8] The circuit court's rationale for this decision was that any reference to Hirsi being charged with a crime in connection with the St. Paul shooting would be "too confusing to the jury so they're not going to hear that you were convicted of something in Minnesota; and they're not going to hear that you weren't." The court further explained that "there's too many different— too many issues there. We're not going to retry the Minnesota case. The evidence is limited to [identity]."

[9] Referring to *Dowling v. United States*, 493 U.S. 342 (1990).

[10] Referring to *State v. Landrum*, 191 Wis. 2d 107, 528 N.W.2d 36 (Ct. App. 1995).

[11] We note that Hirsi did not request any limiting instruction be read to the jury regarding his acquittal; rather, he sought to introduce evidence of his acquittal during the evidentiary phase of the trial. We do not address the State's argument that Hirsi's failure to request the instruction constituted a forfeiture of the issue, however, as we address the lack of a limiting instruction being read to the jury solely to provide guidance on an issue that is likely to arise in future proceedings.

admission of evidence of other acts for which a defendant has been acquitted of has the potential to unfairly prejudice a defendant. *See id.* at 352-54. The Court also recognized that a limiting instruction informing the jury of the acquittal may minimize or eliminate the potential for such prejudice. *Id.* Nonetheless, the *Dowling* Court did not establish a bright-line rule mandating that such an instruction be read to a jury. *See United States v. Tirrell*, 120 F.3d 670, 677 (7th Cir. 1997) ("The Supreme Court's holding in *Dowling*, however, does not require that the jury be told of an acquittal.").

¶36 The same is true of the second case cited by Hirsi, *State v. Landrum*, 191 Wis. 2d 107, 528 N.W.2d 36 (Ct. App. 1995). In that case, we acknowledged that there is a "potential" for prejudice when evidence of other acts for which a defendant has been acquitted is admitted at a subsequent trial for a permissible purpose under WIS. STAT. § 904.04(2). *Id.* at 119-22. We then stated that "[t]he delivery of a limiting instruction serves to eliminate or minimize the risk of unfair prejudice." *Id.* at 122. Nowhere in our decision, however, did we require that such an instruction be read. *Id.*

¶37 Taken together, *Dowling* and *Landrum* establish that a circuit court may, in the exercise of its discretion, read a limiting instruction to the jury to minimize any prejudice created by introducing evidence of other acts for which a defendant has been acquitted. Those cases do not, however, require such an instruction. Accordingly, on remand, if the State again introduces other-acts evidence regarding the St. Paul shooting and Hirsi requests a limiting instruction, the court must exercise its discretion to determine whether to give such an instruction.

17

¶38    Finally, Hirsi argues that the circuit court improperly admitted lay opinion testimony identifying Hirsi as the individual in the surveillance photographs taken at the scene of the St. Paul shooting.  In particular, he faults the court for allowing detective Henry and detective sergeant Willems to tell the jury that they believed Hirsi was the individual depicted in the photographs.

¶39    The admission of lay opinion testimony, pursuant to WIS. STAT. § 907.01, lies within the sound discretion of the circuit court.  *See **State v. Dishman***, 104 Wis. 2d 169, 173, 311 N.W.2d 217 (Ct. App. 1981).  Section 907.01 allows a lay witness to give his or her opinion as long as the opinion is: (1) rationally based on his or her perception; (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) not based on scientific, technical or other specialized knowledge within the scope of an expert witness.  ***State v. Small***, 2013 WI App 117, ¶14, 351 Wis. 2d 46, 839 N.W.2d 160.

¶40    Hirsi challenges Willems' lay opinion testimony on grounds that Willems "lacked foundation to identify Hirsi."  More specifically, he asserts that when a witness has not had "sustained contact"[12] with a person prior to trial, "there is an arguable lack of foundation to provide such an opinion on identity."

¶41    We reject Hirsi's argument because it is inconsistent with our case law.  To explain, in *Small* we noted that an officer's testimony that he had viewed a "video more than '100 times' and closely studied some '800 photographs' of incidents recorded by the video, even though he was not at the events recorded or

---

[12] Hirsi contends that a lack of "sustained contact" was proven when Willems testified that he had never met Hirsi prior to the Hudson shooting.

photographed" was sufficient foundation to allow the admission of the officer's lay testimony about the contents of the video. *See Small*, 351 Wis. 2d 46, ¶15.

¶42 Similarly, here, Willems testified that he had spent "hundreds" of hours investigating the Hudson shooting, and that his familiarity with the case allowed him to identify Hirsi in the photographs. We therefore cannot conclude that the circuit court erroneously exercised its discretion by allowing Willems' challenged testimony.

¶43 As to Hirsi's challenge to Henry's testimony identifying him in the surveillance photographs, he asserts that "her testimony suffered from a different problem—it violated Hirsi's confrontation rights because Hirsi wasn't permitted to fully confront or cross-examine her about possible bias."[13] Hirsi's argument that he was not "permitted to fully confront" Henry, however, rests on only an assumption that the circuit court would have restricted his ability to cross-examine Henry regarding any bias toward him.

¶44 Although Hirsi casts it as a foregone conclusion that the circuit court would have restricted any such cross-examination—based on the court's pretrial decision to exclude references to the trial in the St. Paul shooting—his failure to even attempt to do so deprived the court of an opportunity to address the issue in this particular context. We therefore have no basis on which to evaluate the court's exercise of discretion regarding the admission of Henry's lay opinion testimony, because no such exercise occurred in the first instance.

---

[13] Hirsi's assertion that Henry bore a "possible bias" toward him is based on his speculative statement that "she likely felt Hirsi escaped justice" in the case related to the St. Paul shooting.

## CONCLUSION

¶45 In sum, we conclude that the admission of expert testimony informing the jury that Somalis have a tendency to fabricate events constituted plain error. We therefore reverse and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.