STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Aaron LINDH, Defendant-Appellant.

Supreme Court

*No. 89-0896-CR. Argued January 25, 1991.—Decided April 17, 1991.*

(Also reported in 468 N.W.2d 168.)

327

329

For the plaintiff-respondent-petitioner the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the defendant-appellant there was a brief filed by *Keith A. Findley,* assistant state public defender and

*Kenneth P. Casey,* chief, appellate division and oral argument by *Kenneth P. Casey.*

STEINMETZ, J. The principal issue in this case is whether the trial court abused its discretion by ruling in favor of the state's *in limine* motion to restrict defense impeachment of one of the state's psychiatric witnesses during the mental capacity phase of the bifurcated trial.

A second issue is whether the trial court abused its discretion during the mental capacity phase of the trial by refusing to suppress the use of statements taken from the defendant by a psychiatric witness within hours of the defendant's arrest.

With respect to the first issue, the court of appeals reversed the circuit court for Dane county, Judge Robert R. Pekowsky, holding that the trial court's order restricting defense impeachment of the state's psychiatric witness was an abuse of discretion and remanding the case for a new mental capacity phase of the trial. With respect to the second issue, the court of appeals affirmed the trial court's decision allowing the introduction of the defendant's statements.[1]

We reverse the court of appeals and hold that the trial court did not abuse its discretion in granting the state's motion *in limine.* We affirm that portion of the court of appeals decision which held that the trial court did not err by refusing to suppress the use of the statements challenged by the defense.

---

[1]*State v. Lindh,* 156 Wis. 2d 768, 457 N.W.2d 564 (Ct. App. 1990).

The issues relate only to "phase II," the mental capacity phase of a bifurcated trial, pursuant to sec. 971.165, Stats. At phase I, the guilt phase of the trial, the defendant, Aaron Lindh, was charged with the following offenses: two counts of first-degree murder, contrary to sec. 940.01, Stats.; one count of attempted first-degree murder, contrary to secs. 939.32(1)(a) and 940.01; committing the acts alleged above while using a dangerous weapon, contrary to sec. 939.63(1)(a)2; and one count of carrying a firearm in a public building, contrary to sec. 941.235(1). Lindh pleaded guilty to the firearm and dangerous weapon charges and was found guilty of the other charges by a jury. At phase II of the trial, Lindh, pursuant to sec. 971.15,[2] claimed he had a mental disease at the time of the crimes and so pleaded not guilty for that reason. The jury found that Lindh did not have a mental disease at the time of the crimes. Accordingly, a judgment of conviction was entered against Lindh on all charges.

The charges arose out of an incident occurring during the noon hour of January 15, 1988. Lindh was in the City-County Building in Madison, Wisconsin, to meet

[2]Section 971.15, Stats., provides as follows:

**Mental Responsibility of defendant.** **(1)** A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

**(2)** As used in this chapter, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

**(3)** Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

with officers of the Madison Police Department.[3] After talking with certain police officers, Lindh apparently left the building and went to his automobile parked nearby, in which he had a modified .22-caliber rifle. Lindh then re-entered the building and proceeded to walk into an office of the Dane County Sheriff's Department, hiding the rifle under the coat he was wearing. There, he summarily shot and killed Eleanor Townsend, a sheriff's department secretary, and then shot and seriously injured Erik Erikson, a private citizen who was present for the purpose of paying a parking ticket. He then proceeded to the county coroner's office, where he shot and killed Clyde Chamberlain, the coroner. He then brandished the gun at a deputy sheriff, advanced on the officer and challenged the officer to shoot and kill him. Lindh was shot, disabled and transported to Madison Meriter Hospital where he underwent surgery. After surgery, Lindh was taken to the hospital's intensive care unit where he remained through the evening.

Late in the afternoon of the shootings, Dane County Assistant District Attorney John Burr retained Dr. Leigh Roberts, whom Burr considered "one of the best forensic psychiatrists around." Dr. Roberts was informed of the shootings. He was told that Lindh had been taken into custody, that questions might be raised regarding Lindh's mental state during the shootings, and that he might be requested to interview Lindh in this connection.

That evening, shortly after 8:30 p.m., two detectives from the Madison Police Department visited Lindh in

---

[3]The meeting evidently was either for the purpose of discussing the department's progress concerning its investigation of two burglaries of Lindh's apartment that had occurred during the previous week or for the purpose of discussing the imminent disposition of a charge Lindh was facing.

the intensive care unit. They identified themselves to Lindh as police officers and indicated that they wanted to talk with him about the shootings in the City-County Building earlier that day. The detectives fully advised Lindh of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966),[4] which rights he waived. The detectives questioned Lindh for approximately 35 minutes.

At 9:00 p.m. that evening, the district attorney's office contacted Dr. Roberts at his home and requested that he interview Lindh that same evening. Dr. Roberts agreed to do so and arrived at Lindh's bedside at 9:33 p.m. He explained to Lindh that Assistant District Attorney Burr had sent him and indicated that the interview was taking place "at the request of the District Attorney's office." Before beginning his interview of Lindh, Dr. Roberts essentially reiterated to him all of his *Miranda* rights, except that he did not inform him that before any interview an attorney would be provided to him at county expense if he wanted and could not afford one. Dr. Roberts also informed Lindh that the purpose of his interview related to assessing Lindh's mental state at the time of the shootings. Lindh did nothing to suggest that he was not disposed to such an interview.

Dr. Roberts began to question Lindh, asking him if he could recall what happened earlier that day in the City-County Building. Lindh said he had a limited amount of recall but described shooting two men and a woman. When asked why he shot them, Lindh responded that he did not know. When asked if he cared to discuss the details of the shootings, he answered in the negative. At that point, Dr. Roberts suggested to Lindh that he might not want to talk with him at all, since Lindh did not have an attorney present. "Well,"

[4]*See State v. Hernandez,* 61 Wis. 2d 253, 257, 212 N.W.2d 118 (1973), in which these rights are set forth and discussed.

Dr. Roberts said to Lindh, "I'll wait a few minutes and come back and talk with you again." Dr. Roberts then left the defendant alone because, in his words:

> I wanted to be very sure that he understood, really, the purpose of my being there, and that he understood his rights in relation to anything that he might share with me, because, in general, I'd much prefer that he have an attorney prior to that time, and that his attorney be aware that he was talking with me.

Twelve minutes later, Dr. Roberts returned to Lindh's bedside. Before talking with Lindh, Dr. Roberts again generally informed him of his rights concerning the interview. Lindh responded that he understood he did not have to talk with Dr. Roberts and understood why Dr. Roberts was with him. Lindh again affirmed that he understood that anything said would not be confidential. Again, Dr. Roberts suggested to Lindh that he might want to have an attorney before he talked. Lindh indicated, however, that he would talk with Dr. Roberts.

Dr. Roberts proceeded to question Lindh about the shootings as well as about his personal and family background. Lindh again indicated that he shot three human beings, none of whom he knew personally, that day at the City-County Building. He also spoke of two burglaries of his apartment that had taken place within the past week, the second occurring on the eve of the shootings. In addition, he indicated that he was dissatisfied and angry after the meeting he had with police at the City-County Building some minutes prior to the shootings. In response to questions from Dr. Roberts concerning his recent and current mental state, Lindh indicated that he was not suicidal, that he did not have significant depression, that he was not experiencing hallucinations, hearing voices or seeing visions, and that he had not

337

been experiencing any significant eating or sleeping problems. Dr. Roberts later testified to his opinion that Lindh, based upon his ability to converse, absence of slurred speech, and responsive answers to specific questions the nature of which is indicated above, was able to understand what was taking place and being said at the interview. Dr. Roberts stopped the interview at about 10:25 p.m., when Lindh indicated he was experiencing some pain.

On February 26, 1988, Lindh was arraigned and entered his pleas of not guilty and not guilty by reason of mental disease. At the request of the district attorney, the court appointed Dr. Roberts and Dr. Frederick Fosdal, another forensic psychiatrist, to examine the defendant on behalf of the state.

On March 8, 1988, Dr. Roberts became aware of allegations of professional misconduct against him. Specifically, he became aware that the University of Wisconsin Hospital was investigating an allegation that he had engaged in sexual misconduct with a female patient. He gave no particular thought at the time to the fact that there was a potential for a criminal charge to be made against him and that such a charge could involve the Dane County District Attorney's office. However, he generally knew at the time about the existence of a state law which could subject him, as a therapist, to criminal penalties if such an allegation as that made against him were true.[5] He was not aware of what penalty could be prescribed if he were charged and convicted. He presumed that, were any prosecution to be carried out, it would happen in Dane county, where the allegations were made and therefore would be conducted by the Dane county district attorney's office.

---

[5]Specifically, sec. 940.22, Stats., provides criminal penalties for the sexual exploitation of a patient or client by a therapist.

In May 1988, Dr. Roberts learned that the Medical Examining Board was also investigating allegations of sexual misconduct by him with three female patients after the examining board made a request of him to provide it with records.

Dr. Roberts interviewed Lindh again on June 22, 1988, at the Dane county jail. The next day, June 23, University of Wisconsin Hospital attorneys met with Dane County District Attorney Hal Harlowe and referred to him the allegations against Dr. Roberts. At the same meeting, Harlowe informed those attorneys that he would transfer the matter to a special prosecutor. After the meeting, Harlowe immediately undertook to transfer the matter to the office of Milwaukee County District Attorney E. Michael McCann so as to establish that office as special prosecutor in the matter.

The Dane county district attorney's office sought this transfer in light of the fact that it had worked closely with Dr. Roberts on the prosecution of a number of past and pending cases. The district attorney's office considered that that relationship could constitute a conflict of interest for both Dr. Roberts and the district attorney's office if it were to investigate or prosecute Dr. Roberts. The Dane county circuit court officially appointed the Milwaukee county district attorney's office as special prosecutor on June 28 or 29, 1988.

Dr. Roberts was never contacted by any member or representative of the Dane county district attorney's office, nor was he contacted by any police officer, concerning the allegations against him. Nor did anyone from the Dane county district attorney's office have any contact with Dr. Roberts' attorney about the allegations. Not until July 8, 1988, did Dr. Roberts become aware, through his attorney, that allegations had been referred to the Dane county district's office; at the same time, he

became aware that the special prosecutor already had been appointed.

No formal or informal decision was made by the Dane county district attorney's office as to whether any criminal investigation or charges should be made against Dr. Roberts prior to the appointment of the special prosecutor. No one from the Dane county district attorney's office had any contact with the special prosecutor or discussed the matter with the special prosecutor after the special prosecutor appointment.

On August 17, 1988, Dr. Roberts submitted a report concluding that Lindh was not suffering from a mental disease or defect at the time of the shootings. On August 22, 1988, he interviewed Lindh for the last time.

On September 7, 1988, the defense filed a "Specific Demand for Exculpatory Evidence" regarding the complaint against Dr. Roberts before the Medical Examining Board. The complaint was attached to the discovery demand in which the defense set forth a list of specific questions to be answered, including questions as to when Dr. Roberts first became aware that the allegations had been made; when he was first aware the allegations could result in criminal charges; when the allegations were referred to the Dane county district attorney's office; when a special prosecutor was appointed, when Dr. Roberts became aware of this; and whether the Dane county district attorney's office had made any decision as to whether charges should be filed.

The state promptly responded to the demand, denying that any of the material requested was exculpatory but fully answering each and every question set forth by the defense.[6] The state also filed, on September 12, 1988,

---

[6]The information contained in the state's answers, entirely undisputed by the defense, is incorporated within this factual portion of this opinion.

a motion *in limine* requesting that the trial court prohibit any cross-examination of Dr. Roberts concerning the allegations of misconduct pending against him or concerning any ramification of those pending allegations, including but not limited to the status of Dr. Roberts' hospital privilege at the University of Wisconsin Hospital. The motion asserted that any such inquiry by the defense would be "totally irrelevant and immaterial to the issues" before the court.

A hearing on the state's motion was held on September 13, 1988. At that hearing, the defense acknowledged that the state had fully complied with its discovery demand. It also indicated it was alleging no wrongdoing or bad faith on the part of the prosecution. The parties argued the merits of the state's motion, the defense arguing that the circumstances raised serious questions relating to the bias, motive and interest of Dr. Roberts. The defense also argued more generally that Lindh should be permitted to explore the credibility of Dr. Roberts as an expert witness. In this connection, the defense, although it had no support in the record upon which to base its position, asserted that University of Wisconsin Hospital had temporarily suspended Dr. Roberts' privilege to treat patients at that institution after conducting its own investigation. Lindh argued that he should be permitted, during his own questioning on Dr. Roberts' qualifications, to question Dr. Roberts concerning the allegations against him and his purported suspension so that the prosecution would not be able to present Dr. Roberts as "pure as the driven snow."

The state argued that the allegations contained in the board's complaint were not relevant to the issues of bias, motive or interest. The state argued that the allegations did not go to bias because when Dr. Roberts was retained and appointed, the prosecution was not looking

to him for any particular result from his evaluation of Lindh but simply his professional opinion. In this regard, the state noted that some five weeks prior to the filing of his report Dr. Roberts was aware that a special prosecutor had been appointed and that the Dane county district attorney's office had absolutely no involvement with the case. The prosecutor argued it was too implausible to think Dr. Roberts would file a report with the hope that it would help him in Dane county when he knew that the matter was under Milwaukee county jurisdiction. Even if the proffered evidence were marginally relevant, the state said, it would be extremely prejudicial and cause the jury to focus on an issue unrelated to the question of Lindh's mental capacity at the time of the shootings, and therefore should not be allowed.

Concerning the defense's more generally stated line of inquiry as to Dr. Roberts' character or credibility as an expert witness, the state responded that an expert witness should be treated like any other witness and that there was no basis to question Dr. Roberts about the allegations. The state argued that cross-examination pertaining to the allegations of sexual misconduct and purported hospital suspension would serve no purpose insofar as those matters did not reflect on Dr. Roberts' qualifications as an expert witness. Such cross-examination, the prosecution said, would serve only to "trash" Dr. Roberts, to put him on trial and draw the issue away from the mental responsibility of Lindh.

Following extensive arguments by the parties, the trial court, after having "given a lot of thought to this," found the proffered evidence to be "irrelevant and immaterial." Rejecting the defense's theories of relevancy, the trial court expressly considered that, particularly given that the matter of the allegations against Dr. Roberts was transferred "almost instantaneous[ly]" out of the

Dane county district attorney's office to the office of the special prosecutor, there was no possibility of bias, motive or interest on the part of Dr. Roberts. "I do not find anything in this record which would support or permit counsel to inquire as to [that issue]," the court said. The trial court added:

> And I think it's fair to say that, no matter what [Dr. Roberts does] for the Dane county district attorney's office, [he] would not be able to influence any result, as a result of [the special prosecutor's] investigation or any judge that might ultimately hear it, should there be any criminal charges filed.

Even though it had already found the proffered evidence not relevant, the trial court apparently assumed for the sake of argument that the proffered evidence might be at least marginally relevant such that it should be "balanced" against the risk of unfair prejudice so as to determine its admissibility pursuant to sec. 904.03, Stats. In conducting its balancing test, the trial court found that the risk of unfair prejudice to the state would outweigh any relevance. The court expressly noted that the allegations against Dr. Roberts were nothing more than allegations and said that there was the risk that the jury would think that "if there's smoke, there's fire." Thus, the court held that cross-examination pertaining to the allegations against Dr. Roberts and his purported hospital suspension was not admissible. The court therefore granted the motion *in limine.*

At the same time, the court gave defense counsel the right to *voir dire* Dr. Roberts outside the presence of the jury, and a *voir dire* hearing took place before Dr. Roberts testified at phase II of the trial. The hearing essentially amounted to a reiteration by Dr. Roberts of much of the information contained in his response to Lindh's

discovery demand. In addition, Dr. Roberts stated at the hearing that when he was first called into the case by Assistant District Attorney Burr he was not aware that any allegations against him were threatened. He also stated that he was not aware that District Attorney Harlowe had met with University of Wisconsin Hospital attorneys until the date of the hearing. The defense did not dispute these statements by Dr. Roberts. Based upon the *voir dire* hearing, the trial court found no basis to alter its ruling granting the motion *in limine.*

At phase II, Dr. Ezra Griffith, a forensic psychiatrist, testified for the defense. After giving a lengthy introduction as to his professional qualifications and background, Dr. Griffith testified to a reasonable degree of medical certainty that on the day of the killings the defendant was in a psychotic state which he diagnosed as a "brief reactive psychosis," and that as a result of that psychotic state Lindh lacked substantial capacity to appreciate the wrongfulness of his conduct and lacked substantial capacity to conform his conduct to the requirements of law. He also testified to a reasonable degree of medical certainty that Lindh had been suffering from mental diseases or disorders long before January 15, 1988. He characterized these long-term disorders as "mixed personality disorder."

The principal expert witness for the state was Dr. Roberts. At the outset of his testimony, Dr. Roberts indicated that he was: a faculty member at the University of Wisconsin Medical School; "on the adjunct faculty at San Francisco Theological Seminary"; chairperson of conferences "relating to religion and mental health"; previously "honored . . . as essentially the mid-west psychiatrist of the year"; and, a grandfather. Dr. Roberts proceeded to give his opinion that the defendant did not suffer a mental illness at the time of

344

the crimes, that a personality disorder is not a mental disease, and that a conduct disorder is not a mental disease. He testified to his opinion that the defendant was not suffering a brief reactive psychosis at the time of the offenses. He gave his opinion that the defendant knew his conduct was wrong and that he could conform his conduct to the requirements of the law.

The state also called Dr. Fosdal who stated that he diagnosed Lindh as suffering a mixed personality disorder. He testified, however, that such a disorder does not prevent one from appreciating the wrongfulness of his conduct or from conforming his conduct to the requirements of the law. He testified to his opinion that the defendant did not suffer a brief reactive psychosis at the time of the crimes, did not have a mental disease, and suffered no impairment of his ability to conform his conduct to the requirements of the law.

\* \* \* \*

With respect to the first issue, Lindh contends that the evidence he wished to show on cross-examination of Dr. Roberts was wrongfully excluded to the extent it might have shown bias on the part of Dr. Roberts, who, facing the possibility of a criminal investigation and criminal charges, allegedly might have wanted to curry favor with the prosecutor by reporting a diagnosis of Lindh's mental state that would favor the prosecution against Lindh. Lindh also asserts more generally that the evidence was relevant to Dr. Roberts' character and credibility.

The confrontation clause of the Sixth Amendment of the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted

with the witnesses against him." By virtue of the fourteenth amendment, this right is applicable to the citizens of this state. Article I, sec. 7 of the Wisconsin Constitution essentially provides the same right, indicating that an accused has a right to meet his witnesses "face to face." " ' "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" ' " *Delaware v. Van Arsdall,* 475 U.S. 673, 678 (1986), *quoting Davis v. Alaska,* 415 U.S. 308, 315–16 (1974) (emphasis in original). " '[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " *Id.* at 678–79.

Nevertheless:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Id.* at 679. The confrontation clause " 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish.' " *Id., quoting Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (emphasis in original).

Wisconsin evidence law conforms with these fundamental precepts. If evidence is relevant, as defined by sec. 904.01, Stats.,[7] it is admissible, unless its introduction would be prohibited by another rule or the constitu-

---

[7]Section 904.01, Stats., provides:

'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determi-

tions of the United States or Wisconsin. Section 904.02, Stats.[8] Even if admissible, evidence may be excluded if its probative value is substantially outweighed by other factors, including risk of unfair prejudice. Section 904.03.[9] Section 906.08.[10] pertains specifically to evi-

nation of the action more probable or less probable than it would be without the evidence.

[8]Section 904.02, Stats., provides:

All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

[9]Section 904.03, Stats., provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[10]Section 906.08, Stats., provides as follows:

**Evidence of character and conduct of witness. (1)** OPINION AND REPUTATION EVIDENCE OF CHARACTER. Except as provided in s. 972.11(2), the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to these limitations: a) the evidence may refer only to character for truthfulness or untruthfulness, and b), except with respect to an accused who testifies in his or her own behalf, evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

**(2)** SPECIFIC INSTANCES OF CONDUCT. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crimes as provided in s. 906.09, may not be proved by extrinsic evidence. They may, however, subject to s. 972.11(2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

dence of character and conduct of witnesses.

"The criterion of relevancy is whether the evidence sought to be introduced would shed any light on the subject of inquiry." *Rogers v. State,* 93 Wis. 2d 682, 688, 287 N.W.2d 774 (1980). In *Rogers,* we also said that:

> The proper standard for the test of relevancy on cross-examination is not whether the answer sought will elucidate any of the main issues in the case but whether it will be useful to the trier of fact in appraising the credibility of the witness and evaluating the probative value of the direct testimony.

*Id.* at 689. The scope of cross-examination is not limited to the scope of the direct examination. *Id.* However, to be relevant, the proffered evidence must have a logical or rational connection with the fact sought to be provided. *State v. Williamson,* 84 Wis. 2d 370, 384–85, 267 N.W.2d 337 (1978). There must be a reasonable relation between the evidence sought to be introduced and the proposition to be proved before the cross-examination will be allowed. *Rogers,* 93 Wis. 2d at 691.

We previously have noted that evidentiary determinations are a matter of trial court discretion. *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983); *Rogers,* 93 Wis. 2d at 689. This discretion of the trial court is broad. *State v. Oberlander,* 149 Wis. 2d 132, 140, 438 N.W.2d 580 (1989). The appellate court should reverse a trial court's determination to limit or prohibit a certain area of cross-examination offered to show bias

---

**(3)** TESTIMONY BY ACCUSED OR OTHER WITNESSES. The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

only if the trial court's determination represents a preju-
dicial abuse of discretion. *Williamson,* 84 Wis. 2d at
384-85; *State v. Whiting,* 136 Wis. 2d 400, 422, 402
N.W.2d 723 (Ct. App. 1987). In *Hartung v. Hartung,* 102
Wis. 2d 58, 66, 306 N.W.2d 16 (1981), this court stated:

> It is recognized that a trial court in an exercise of its
> discretion may reasonably reach a conclusion which
> another judge or another court may not reach, but it
> must be a decision which a reasonable judge or court
> could arrive at by the consideration of the relevant
> law, the facts, and a process of logical reasoning.

*See also Oberlander,* 149 Wis. 2d at 140-41. No abuse of
discretion will be found if a reasonable basis exists for
the circuit court's determination. *Oberlander,* 149 Wis.
2d at 141.

We hold that the trial court did not abuse its discre-
tion in determining that the proffered evidence was not
relevant to show bias, motive or interest or more gener-
ally the character or credibility of Dr. Roberts as an
expert witness. The court of appeals erred in substituting
its discretion for that of the trial court.

In reaching its decision, the court of appeals con-
cluded Lindh should have been allowed to cross-examine
Dr. Roberts "as to the fact that allegations of miscon-
duct were pending against him and the serious effect
upon his profession and livelihood if he were convicted
of the charges alleged" and that Lindh should have been
allowed to inquire "whether, during the period in ques-
tion, he was investigated with respect to possible crimi-
nal conduct which, upon conviction, would have serious
professional and personal consequences." This conclu-
sion ignores the fact that the trial court had a reasonable

basis to conclude that the proffered evidence simply was not in any way relevant.

From the time Dr. Roberts first interviewed Lindh in the hospital on January 15, 1988, through the times that he interviewed him in June 1988 and August 1988 and up through and including September 1988, there is no evidence in the record that a criminal investigation was being conducted—or, indeed, that one ever was conducted—regarding any allegations against Dr. Roberts. At most, it is known that the matter of the complaints by Dr. Roberts' patients against him was referred to the Dane county district attorney's office in June and that the matter was immediately transferred to the Milwaukee county district attorney's office for any investigation it would choose to pursue and any prosecution it would choose to conduct. There is no evidence that after that time and as of the time of trial, the Milwaukee county district attorney's office ever began any criminal investigation.[11]

Clearly, up until July 8, 1988, there was no reasonable possibility for bias, motive or interest on the part of Dr. Roberts because until that date he did not know that any allegations had been referred to the Dane county district attorney's office. Because Dr. Roberts became aware of the immediate transfer of the matter to the special prosecutor at the same time, he had no reason to believe after July 8, 1988, that the Dane county district attorney's office would be in a position to prosecute him and thus possibly favor him in exchange for his testi-

---

[11] An investigation of Dr. Roberts eventually was undertaken by the special prosecutor who brought charges against Dr. Roberts. Dr. Roberts pleaded no contest to these charges. Although the record does not indicate the exact dates of these events, it is clear that they all occurred subsequent to Dr. Roberts' testimony at phase II of Lindh's trial.

mony. Dane county was not in a position to make any "deals," reduce any charges, or even make any recommendation as to any criminal investigation or prosecution against Dr. Roberts and Dr. Roberts knew it. He therefore had no reason to favor the prosecutor in the instant case by testifying or giving a report favorable to him.

The relationship between the Dane county district attorney's office and Dr. Roberts which would be necessary to suggest bias, interest or motive simply did not exist. The disclosure provided by the prosecutor upon the request of the defense and the *voir dire* of Dr. Roberts unequivocally showed the same thing. There is no reason whatsoever to conclude that there was fertile ground for even the seed of a "deal" to be sewn and to germinate under these circumstances. To suggest that Dr. Roberts' testimony would be influenced in favor of the prosecution under these circumstances amounts to mere speculation. There being no nexus between the future criminal investigation and prosecution of Dr. Roberts, if any were to be undertaken, and the Dane county district attorney's office, a jury could not reasonably find a logical connection between the two, because none existed. Thus, it was not an abuse of discretion not to allow the matter to be brought up on cross-examination.

Analogous decisions from other jurisdictions support our conclusion. In *Guttierez v. State,* 681 S.W.2d 698, 706–07 (Tex. Ct. App. 1984), the court held it was not an abuse of discretion to prohibit cross-examination of a state witness on pending charges under circumstances where the county attorney, not the district attorney prosecuting the defendant's case, had authority over the witness's pending charges; no deals had been made

with the witness; nobody in the district attorney's office had suggested lenient treatment and there was no evidence elicited at the *voir dire* of the witness which suggested he had a self-interest in his testimony.

Similarly, in *State v. Bracy,* 145 Ariz. 520, 703 P.2d 464 (1985) (en banc), the court held that it was not unreasonable to refuse to allow the defendant to cross-examine a state witness on a pending contempt charge. The county attorney prosecuting the case in which the witness was to testify was not involved in the pending contempt charge. A special, independent prosecutor had full responsibility for the contempt charges. Thus, the court held that the pending charge "would not have indicated that [the witness's] testimony was colored by any hope of lenient treatment from the County Attorney." 145 Ariz. at 533, 703 P.2d at 477.

These cases stand for the proposition that, where a witness is himself subject to a prosecution by those who are separate and distinct from those who have called him as a witness, there is no reasonable basis to believe the witness has a motive to curry favor or hope for leniency by virtue of his testimony. This clearly is the situation in the instant case. Because of the fact that any prosecution by the special prosecutor against Dr. Roberts at some point in the future was merely a possibility, there was no reasonable basis to believe that Dr. Roberts would color his report or testify to some sort of bias, motive or interest. As courts have indicated, cross-examination for bias is not opportune when there exists the mere possibility of future or potential charges. *See generally, State v. Grasso,* 172 Conn. 298, 374 A.2d 239, 242 (1977); *People v. Simmons,* 99 Ill. App. 3d 519, 425 N.E.2d 1168, 1172 (1981). It is not even the case that, as a psychiatric professional, Dr. Roberts was called upon

to "rise above" influences that might lead to bias, motive or interest on his part, for no such influences ever existed.

The cases upon which Lindh relies in this regard[12] stand in sharp contrast to the situation in the case at bar, although the defendant presents them for the broad proposition that a witness may be cross-examined about the threat of criminal prosecution and not just about pending charges. In the cases offered by Lindh, the evidence had a direct and immediate nexus to bias, motive to testify falsely or motive to favor the prosecution. The cases involved actual or pending criminal charges or a direct and immediate ongoing criminal investigation or imminent threat of criminal charges by a government agent directly involved in the case in which the witness was to testify. In the case at bar, there were no pending criminal charges. There was no ongoing criminal investigation. If a criminal investigation were undertaken and charges were brought in the future, those charges would be brought by the special prosecutor, not by the Dane county district attorney's office.

Certain cases cited by Lindh generally evidence what the United States Supreme Court in *Van Arsdall,* 475 U.S. 673, called a "prototypical form of bias." In *Van Arsdall,* the trial court prohibited any cross-examination on the fact that the state had dropped a public drunkenness charge, actually filed, in exchange for the witness's promise to speak with the prosecutor about a murder. The Supreme Court held that the total prohibi-

---

[12]Lindh relies upon *Cowheard v. State,* 365 So. 2d 191 (Fla. Dist. Ct. App. 1978); *State v. Chestnut,* 621 P.2d 1228 (Utah 1980); *United States v. Hitchmon,* 609 F.2d 1098 (5th Cir. 1979); *Burr v. Sullivan,* 618 F.2d 583 (9th Cir. 1980); *United States v. Onori,* 535 F.2d 938 (5th Cir. 1976); and *Greene v. Wainwright,* 634 F.2d 272 (5th Cir. 1981).

tion of all inquiry into this "prototypical form of bias" violated the defendant's constitutional right of confrontation by "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." *Id.* at 679–80.

Although *Van Arsdall* did not specifically define "prototypical form of bias," the context of the case makes it clear that the court was referring to a situation in which a witness might have or realistically perceive an interest in testifying so as to favor the prosecution. For example, in *Van Arsdall,* the witness was in a position to and actually did testify in exchange for reduction in charges or sentence.

Other cases cited as persuasive by Lindh manifest a comparable prototypical form of bias. In *Davis v. Alaska,* 415 U.S. 308, 316–18 (1974), the juvenile witness was on probation and thus distinctly "vulnerable," as the Supreme Court described it, to influences which might raise questions of biases, ulterior motives and prejudices that "relate directly to issues or personalities in the case at hand." Specifically, because of his probationary status, the witness might have been effectively encouraged to make a faulty initial identification of the defendant in order to shift suspicion away from himself as to the same incident, and he also might have been subject to undue pressure from the police and made his initial identifications under fear of possible probation revocation. *Id.* at 311, 317. This in turn could have affected his later in-court identification. *Id.* at 317.[13]

---

[13]In this regard, the United States Supreme Court noted that " '[a] *partiality* of mind at some *former time* may be used as the basis of an argument to the same state at the time of testifying; though the ultimate object is to establish partiality at the time of

There was also a prototypical form of bias evident in *State v. Lenarchick,* 74 Wis. 2d 425, 247 N.W.2d 80 (1976), where charges were pending against the witness. Prior to trial, one charge was dropped and two charges against the witness were being held open. Addressing the problem as one of constitutional dimension, the court said that:

> When a witness has been criminally charged by the state, he is subject to the coercive power of the state and can also be the object of its leniency. The witness is aware of that fact, and it may well influence his testimony.

*Id.* at 447–48. Under such circumstances, this court held, "[a] defendant, as an ingredient of meaningful cross-examination, must have the right to explore the subjective motives for the witness' testimony." *Id.* at 448.

In *State v. Balistreri,* 106 Wis. 2d 741, 317 N.W.2d 493 (1982), a prototypical form of bias was effectively accorded proper exposure at trial. The witness had been arrested for criminal acts resulting in plea negotiations which reduced the witness's potential sentence from 105 to 40 years. In ruling that the trial court properly excluded testimony as to the factual details of prior criminal acts of the witness, the nature and number of

---

testifying.' " *Id.* n.5 (emphasis in original). While the defendant in the case at bar might have attempted to use this statement to argue that Dr. Roberts might have had a meaningful "partiality of mind at some former time" comparable to that envisaged by the Supreme Court in *Davis,* such an argument would be a manifestly unreasonable one. There is absolutely nothing in the record to suggest any reasonable possibility that Dr. Roberts ever held any bias, motive or interest that conceivably might have affected his testimony.

which were already made known to the jury by the witness on direct examination, the court said that:

> 'The main objective [of allowing cross-examination pertaining to a witness' criminal acts and plea negotiations] is to show that the witness may have expected leniency or immunity from prosecution if he gave testimony in favor of the state, and it is necessary to show the commission of wrongful acts in order to establish the basis for such an expectation.'

*Id.* at 753, *quoting Lenarchick,* 74 Wis. 2d at 447. Thus, while the cross-examination properly could have included inquiry into the general existence of the plea negotiations and the criminal acts to which the negotiations were related, such was not the case with respect to the factual details of the prior criminal acts of the witness in *Balistreri,* because they would not show that the witness may have expected leniency or immunity in exchange for his testimony.

In cases where there exists a prototypical form of bias, the possibility of bias, motive and interest of the witness is particularly distinct and immediate. The witness has an ongoing, dual relationship with the prosecutory actors. On the one hand, the witness as such is being of some service to the prosecution by giving his testimony; on the other hand, his status with respect to the same prosecution is "vulnerable." Criminal process of some sort against the witness, even if only at its initial stages, is a reality. Usually, it is being carried out by the prosecuting attorneys who are depending on his service as a witness; at the very least, it is being carried out in the same jurisdiction as the one in which the witness is offering his testimony. Under such circumstances, there usually is a reasonable inference that the witness is or considers himself to be in a position of being effectively

more or less "vulnerable" to factors that could influence his testimony. The witness's acts, relationship or situation with respect to the state might be likely to produce at least a strong suspicion of bias, motive and intent in the eyes of a jury. A jury might reasonably have found the evidence "furnished the witness a motive for favoring the prosecution in his testimony." *Van Arsdall,* 475 U.S. at 679.

Lindh does not expose a "prototypical form of bias." Here, the prosecution had not dropped any pending criminal charges against Dr. Roberts, no charges had been reduced or favorably disposed, and Dr. Roberts was not on parole or probation or in custody. There was only the possibility that allegations of sexual misconduct with patients could form the basis of criminal charges. There is not even any claim that a criminal investigation was actually being conducted. Because substantial steps were taken immediately by the Dane county district attorney's office to appoint the special prosecutor upon the referral of the investigation of Dr. Roberts to the district attorney's office, Dr. Roberts had no "prototypical" bias, interest or motive to curry favor with the Dane county district attorney's office which was prosecuting Lindh, because any charges that would be brought against Roberts would be brought by the special prosecutor.

Although the basis of Lindh's other theory of relevancy is not altogether clear, it appears to proceed from a view that the exclusion of the proffered evidence is error because, as he describes it, the state was allowed to present Dr. Roberts as if his character was "pure as the driven snow." Noting that, at the start of his testimony, Dr. Roberts introduced himself as a grandfather, a faculty member at a theological seminary, the chairper-

son of conferences on religion and mental health, and as recipient of an award essentially naming him "midwest psychiatrist of the year," Lindh apparently argues that the mention of such facts in front of the jury entitled him to the particular cross-examination of Dr. Roberts that he desired. Again, we find that the trial court did not abuse its discretion in finding the proffered evidence "irrelevant and immaterial."

The character of a witness may be impeached only in regard to matters which go directly to his reputation for truth and veracity. *Barren v. State,* 55 Wis. 2d 460, 461–66, 198 N.W.2d 345 (1972). We have long considered that on cross-examination into the character of a witness, use of irrelevancies, insinuating that a person is of bad moral character, tending to degrade him in the eyes of the jury, is not a proper impeachment device. *Banas v. State,* 34 Wis. 2d 468, 474, 149 N.W.2d 571, *cert. denied* 339 U.S. 962 (1967). Virtually by definition, such evidence is not relevant, tending only to prejudice the jury against the witness.

The fact that Dr. Roberts may have engaged in professional misconduct and may have been subject to disciplinary measures as a result would not tend to make more or less likely the accuracy and correctness of his diagnosis and professional opinion in this case. The proffered evidence does not have any reasonable tendency to show Dr. Roberts was less qualified to examine and diagnose Lindh and render an opinion as to Lindh's mental capacity and no reasonable jury could so find. Nor would the cross-examination have cast light on Dr. Roberts' character for truthfulness and untruthfulness. The subjects that Lindh wished to discuss on cross-

examination were completely unrelated to Dr. Roberts' truthfulness and abilities as an expert witness.

Far from presenting himself as "pure as the driven snow," as the defense asserts he did, Dr. Roberts simply testified to his past experience and professional background, as do all expert witnesses. The fact that he offered certain innocuous family information without objection from the defendant does not mean that Lindh had a right to cross-examine on the matter of the sexual misconduct allegations.

Dr. Roberts' introduction was qualitatively no different from that of defense psychiatric expert Dr. Griffith, who testified he was: acting director of Connecticut Mental Health Center in New Haven, Connecticut, and was associate professor of psychiatry at Yale University School of Medicine and an associate professor in the Department of Afro-American studies at Yale. Dr. Griffith also testified that he went to Harvard University, took his medical degree at University of Strasburg in France, did residency at the Albert Einstein College of Medicine in New York, that he has a specialty certification in psychiatry and forensic psychiatry, that he teaches a course in the department of Afro-American studies that has to do with the psychological dimensions of black autobiographies, that he is a consultant to the Pan American National Health Organization, Project Hope, and the Commission of Security and Cooperation in Europe of the United States Congress, that he is editor of Black Psychiatrists of Americans Quarterly, that he is on the executive committee of the Black Psychiatrists of America, that he was honored by a fellowship of American Psychiatric Association and received a traveling fellowship from the Solomon Fuller Institute, that he

serves on various boards, and that he has authored a number of articles.

Numerous cases have held that allegations of professional wrongdoing, misconduct or negligence that is unrelated to the case on trial is not a proper subject of impeachment of an expert medical witness. In *State v. Paradise,* 213 Conn. 388, 567 A.2d 1221, 1229–30 (1990), inquiry on cross-examination into a prior investigation of official misconduct by the witness in his prior position as chief medical examiner of New York City would have been of dubious relevance and, moreover, would have led to a mini-trial on the circumstances of unrelated cases. In *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635, 639 (1973), the court held that it was not an abuse of discretion or an error of law for the court to bar cross-examination of a medical expert witness to establish that he had misconducted himself by failing to observe a principle of medical ethics. In *Noble v. Lansche,* 735 S.W.2d 63 (Mo. Ct. App. 1987), it was held reversible error for the trial court to allow an expert witness in a medical malpractice case to be cross-examined on his voluntary surrender of his license to dispense controlled narcotics, due to his own drug problem. The court held the expert's former drug problem was unrelated to his skill, knowledge and qualifications to express an expert opinion in the case; neither the drug abuse nor the surrender of his license affected his qualification as an expert witness or his credibility. The only purpose of such evidence could be to cause disparagement over the expert's testimony by reason of irrelevant misconduct.

*See also Schneider v. Revici,* 817 F.2d 987 (2d Cir. 1987) (fact that an expert witness's license has been temporarily suspended pending an investigation); *Down v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973) (expert's failure to observe a principle of medical ethics); *Sanchez*

*v. Bay General Hospital,* 116 Cal. App. 776, 172 Cal. Rptr. 342 (1981) (question why doctor did not have privileges at certain hospitals); *Niceiki's v. Field,* 37 Ill. App. 3d 763, 347 N.E.2d 320 (1976) (prior malpractice litigation); *see also Pyle v. Morrison,* 716 S.W.2d 930 (Tenn. Ct. App. 1986).

The trial court, even after finding the proffered evidence irrelevant, went on to assume, apparently for the sake of argument, that the evidence was relevant, analyzing the problem pursuant to sec. 904.03, Stats.[14] It then found that any relevance was outweighed by the risk of

---

[14]Apparently because in conducting this balancing test the trial court did not explicitly refer to sec. 904.03, Stats., and did not expressly state that it would engage in "balancing," Lindh has suggested that the trial court failed to exercise its discretion. Because a trial court's failure to exercise discretion constitutes an outright abuse of discretion, *State v. Hutnik,* 39 Wis. 2d 754, 764, 159 N.W.2d 733 (1968), we would reverse the trial court if Lindh's argument were meritorious. However, we find that it is not meritorious.

The fact that the trial court did not expressly state the name of sec. 904.03, Stats., or use the words "weighing" or "balancing" or some similar word or words to describe its analysis, does not mean, that the court failed to exercise its discretion. We do not recognize such a "magic words" argument.

If anything, a trial court's failure to generally refer to its sec. 904.03, Stats., balancing tests might under certain circumstances constitute a "fail[ure] to set forth its reasoning." *See Pharr,* 115 Wis. 2d at 343. Where the trial court does not "set forth its reasoning" for its decision regarding the admission of evidence, we must search the record for a reasonable basis for the decision. *Id.* We will not find an abuse of discretion if any reasonable basis exists for the decision. *Id.* at 342. The fact that a trial court does not expressly balance the probative value of the evidence against the risk of unfair prejudice does not relieve the appellate court of

unfair prejudice from admission of the evidence. We find that the trial court was well within its discretion in that finding. Even if the proffered evidence could be considered marginally relevant to bias, motive or interest or to the character or credibility of Dr. Roberts as an expert, it was reasonable to conclude that the risk of unfair prejudice from admission of the evidence far outweighed the probative value of the evidence, and the cross-examination could have been properly prohibited for that reason.

As the Supreme Court said in *Van Arsdall,* 475 U.S. at 679, bias evidence which is only marginally relevant or which may confuse the issues is excludable. As stated in *Williamson,* 84 Wis. 2d at 384–85, evidence which is relevant to provide bias, like evidence offered to prove other facts, "must also satisfy sec. 904.03, Stats., requiring the trial court to weigh the probative effect of the evidence against its prejudicial effect." *See also, United States v. Abel,* 469 U.S. 45, 54–55 (1984).

> Evidence is unfairly prejudicial if it has a 'tendency to influence the outcome by improper means' or if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish' or otherwise causes a jury 'to base its decision on something other than the established propositions of the case.' *See Christensen v. Economy Fire & Cas. Co.,* 77 Wis. 2d 50, 61, 61 n.11, 252 N.W.2d 81 (1977).

its obligation to do so, if the result would be to sustain the judgment or order.

As for the trial court's actual application of the balancing test in this case, we consider the trial court to have sufficiently set forth its reasoning, *e.g.,* by noting the prejudicial effects that the jury might think "where there is smoke, there's fire."

*Lease America Corp. v. Ins. Co. of N. America,* 88 Wis. 2d 395, 401, 276 N.W.2d 767 (1979).

Other courts have delineated some of the prejudice factors which may warrant the exclusion of bias evidence. One factor is whether the evidence would divert the trial to an extraneous issue. *Hossman,* 467 N.E.2d at 418. A court can and should exclude bias evidence which has little bearing on the witness's credibility, but which would impugn the witness's character because such evidence "opens the door to improper considerations and lends to the confusion of the jury by placing undue emphasis on collateral matters." *People v. Cole,* 654 P.2d 830, 833 (Colo. 1982). If the bias evidence, taken as a whole, might have directed the jury's attention away from the case under consideration, it may be prejudicial. *Id.* at 834.

The trial court may exclude bias evidence if the very slight probative value of the evidence on the issue of bias fails to overcome its strong likelihood of confusion of the issues and undue delay. *United States v. Jarabek,* 726 F.2d 889, 902 (1st Cir. 1984). The appellate court should not find the trial court abused its discretion when the relevance of the proffered bias evidence was unclear and the risk of prejudice was real. *United States v. Sellers,* 658 F.2d 230, 232 (4th Cir. 1981). The trial court may prohibit cross-examination in a certain area where to permit it would open up extraneous matters, for the trial court " 'has responsibility for seeing that the sideshow does not take over the circus.' " *United States v. Brown,* 547 F.2d 438, 446 (8th Cir. 1977).

In the instant case, the risk of unfair prejudice was great. Allegations of sexual misconduct with patients against a psychiatrist have great potential to unduly

prejudice the jury against the witness. Cross-examination on this matter would have distracted the jury from the real issues in the case and would have caused the jury to speculate about unproven charges against the witness. A mini-trial on Dr. Roberts' conduct could have ensued.

The trial court clearly did not abuse its discretion in finding that any relevance of the proffered evidence was outweighed by other factors. Pointing out that the allegations against Dr. Roberts were nothing more than allegations and there was a risk that the jury would think that "if there's smoke, there's fire," the trial court accurately focused on what would have amounted to an unfairly prejudicial admission.

Moreover, in reviewing the trial court's ruling, the appellate court should conclude that the trial court relied on the considerations expressed by the prosecutor as grounds for the court's ruling, where the court obviously acquiesced in the prosecutor's explanation, but did not expressly articulate all of its reasoning itself. *See Hagenkord v. State,* 100 Wis. 2d 452, 464, 302 N.W.2d 421 (1981). In this regard, although we do not consider the trial court to have "acquiesced" as such, we note that in arguing to prohibit the cross-examination, the prosecutor specifically argued that cross-examination about the pending allegations of sexual misconduct with patients would serve no purpose except to "trash" Dr. Roberts, that it would distract the jury from the real issue, the mental responsibility of Lindh, and that it would cause the jury to speculate about an unrelated issue. These are traditional grounds of prejudice under sec. 904.03, Stats.

We hold that the trial court did not abuse its discretion or otherwise err insofar as it concluded that any

relevance of the proffered evidence was outweighed by other considerations, including the risk of unfair prejudice, such that it was not improper to exclude the evidence.

We now turn to the second issue, in which Lindh argues that the trial court erred in refusing to suppress the use of statements taken by Dr. Roberts within hours of Lindh's arrest. Lindh argues that the right against self-incrimination applies to phase II of a trial and that his rights under *Miranda* were not honored.

The Fifth Amendment to the United States Constitution and Article I, sec. 8 of the Wisconsin Constitution guarantee a defendant a right against self-incrimination. Lindh specifically contends that *Miranda* applied in his case insofar as Dr. Roberts conducted his first interview with him at the hospital on the night of the crimes, before the defendant had interposed an insanity defense and before Roberts had officially been appointed as one of the state's experts. Lindh makes this assertion despite the fact that his statements to Dr. Roberts were admitted only at the insanity phase of the trial, only on the issue of Lindh's mental responsibility, only after Lindh interposed an insanity defense and only after he presented expert opinion evidence in support of that defense.

We note as a general matter that the constitution does not apply to prohibit the admission of testimony of a state psychiatric expert in circumstances where the defendant already has interposed an insanity defense and has presented expert testimony in support of that defense. *See Buchanan v. Kentucky,* 483 U.S. 402, 421–22 (1987); *Powell v. Texas,* 492 U.S. 680, 109 S. Ct. 3146 (1989); *United States v. Byers,* 740 F.2d 1104, 1110–11 (D.C. Cir. 1984); *Riles v. McCotter,* 799 F.2d

947, 953 (5th Cir. 1986); *Schneider v. Lynaugh,* 835 F.2d 570, 575-76 (5th Cir. 1988); *Granviel v. Lynaugh,* 881 F.2d 185, 190 (5th Cir. 1989); *State v. Hope,* 96 N.C. App. 498, 386 S.E.2d 224 (1989); *State v. Huff,* 325 N.C. 1, 381 S.E.2d 635 (1989).

Lindh relies upon *United States v. Hinckley,* 672 F.2d 115 (D.C. Cir. 1982) and *Cape v. Francis,* 741 F.2d 1287 (11th Cir. 1984) to support his contention that the right against self-incrimination applies to phase II of a trial. Both cases are clearly distinguishable. In *Hinckley,* F.B.I. agents continued to interrogate the defendant after he requested an attorney and after the defendant said he wanted the interview stopped. The government argued it should at least be allowed to use the defendant's statements and psychiatric opinion evidence based on the police reports of the interview to rebut the defendant's insanity defense. The court held evidence gleaned from the police officer's egregious violation of the defendant's *Miranda* rights could not be used, even for this limited insanity rebuttal purpose, because exclusion was necessary to curtail such misconduct. *Hinckley,* 672 F.2d at 133-34. In *Cape v. Francis,* the court held an expert's opinion that the defendant was sane and criminally responsible could not be admitted at phase I of the case. Moreover, the expert's opinion was based upon the defendant's unwarned statements made during a court-ordered psychiatric exam, and the defendant never raised the insanity defense.

Lindh also relies, unpersuasively, upon *Arizona v. Mauro,* 481 U.S. 520 (1987), which involved a police interview and not a psychiatric interview. The question of whether the fifth amendment applied to the insanity issue was not considered. Finally, Lindh relies on *Estelle v. Smith,* 451 U.S. 454 (1981). In *Estelle,* the trial court had *sua sponte* appointed a psychiatrist to examine the

defendant and determine his competency. After the defendant was found guilty, the state used the psychiatrist's opinion as evidence of the defendant's future dangerousness at the penalty phase of the trial, where the state had the burden of proving future dangerousness in order to secure the death penalty. At the competency hearing, the psychiatrist had not informed the defendant that he had the right to remain silent and he had given the defendant no indication that the court-ordered examination would be used to gather information necessary to decide whether he would receive the death penalty. The court held that under "these distinct circumstances," the defendant's fifth amendment privilege against self-incrimination was violated. *Id.* at 466.

By its own terms, *Estelle* is limited to its facts. In fact, the Supreme Court in *Estelle* clearly appears to have exempted from its holding a situation such as in the instant case, indicating that a defendant who asserts the insanity defense and introduces supporting psychiatric evidence cannot also preclude the state from conducting an examination and introducing the product of that examination. *Estelle,* 451 U.S. at 468.

In *Estelle,* the defendant made his statements unwittingly, unknowing that the state would use them to secure the death penalty, on which issue it had the burden of proof beyond a reasonable doubt. In contrast, in the instant case, the defendant made his statements knowingly. More important, he had the burden of proof, and the evidence from the interview was only used for the purpose of rebutting the defendant's insanity argument. The state was not using the "simple, cruel expedient" of forcing evidence from the defendant's own lips to meet its burden of proof. *Id.* at 462, *quoting Culambe v. Connecticut,* 367 U.S. 568, 581–82 (1961).

We focus on the nature and purpose of the examination and not on its timing. The fact that Dr. Roberts conducted his interview before and not after Lindh interposed his insanity defense would not appear relevant in this regard. There are valid legal and policy reasons for this focus.

█

A psychiatric interview designed to ascertain a defendant's mental responsibility, evidence of which is not admitted until phase II of trial, is not accusatory in nature. It looks at the past conduct of which the interviewer was already aware. We consider that *Miranda* warnings, which are aimed against involuntary self-incrimination, are a prerequisite neither to such an interview nor to admission of the results of the interview at phase II. *Cf. State v. Knapp,* 111 Wis. 2d 380, 388, 330 N.W.2d 242 (Ct. App. 1983); *State v. Heffran,* 129 Wis. 2d 156, 165–66, 384 N.W.2d 351 (1986).

Complete information is essential on the insanity defense, and the best information comes from an expert examination of the defendant himself. To the extent official misconduct needs to be deterred, sufficient deterrence is adequately provided by excluding the evidence from the guilt phase. The great importance and reliability of the defendant's own statements on this issue should not be undercut by any incremental benefits to be gained by suppression. Reliability of the fact-finding process would be decreased by application of the constitutional privilege. *Cf. Allen v. Illinois,* 478 U.S. 364, 374–75 (1986). Admission of the results of a state psychiatric examination of a defendant who raises the insanity defense does not tarnish or diminish the "noble aspirations" and "fundamental values" underlying the privilege against self-incrimination. *See generally Murphy v. Waterfront Comm'n.,* 378 U.S. 52, 55 (1964).

We thus hold that the constitutional privilege against self-incrimination does not require the exclusion of results of a psychiatric interview with the defendant from phase II of a trial on the grounds that the psychiatrist did not comply with the dictates of *Miranda.*

Assuming, *arguendo,* that *Miranda* is applicable in the case at bar, we will consider Lindh's argument that Dr. Roberts failed to scrupulously honor his purported assertion of his right to remain silent when he indicated he did not want to discuss the details of the shootings.

A defendant's exercise of his right to silence must be "scrupulously honored," *State v. Hartwig,* 123 Wis. 2d 278, 284, 366 N.W.2d 866 (1985), citing *Michigan v. Mosley,* 423 U.S. 96, 103 (1975). The critical safeguard of the right to silence is the right to terminate questioning by invocation of the right to silence. *Id.*

These principles notwithstanding, it is clear that Lindh never exercised or invoked his right to silence during his interview with Dr. Roberts on the day of the shooting. Lindh did not assert that he did not want to talk with Dr. Roberts. Never did he say that he did not want to answer additional questions. He did not ask Dr. Roberts to end the interview or to go away. He said only that he did not want to discuss the details of the shootings. That, standing alone, is not an invocation of the right to silence. *See e.g., State v. Koput,* 134 Wis. 2d 195, 202, 396 N.W.2d 773 (Ct. App. 1986), *rev'd on other grounds,* 142 Wis. 2d 370, 418 N.W.2d 804 (1988); *People v. Galimanis,* 765 P.2d 644 (Colo. Ct. App. 1988), *cert. granted,* 783 P.2d 838 (Colo. 1989); *People v. Brockington,* 126 A.D.2d 655, 511 N.Y.S.2d 84, 86 (1987).

369

We conclude that, even if Lindh arguably did invoke his right to remain silent, Dr. Roberts scrupulously honored that right. Whether the questioner used "improper persuasive tactics" or "overbearing or coercive tactics" is determinative. *State v. Turner,* 136 Wis. 2d 333, 357–60, 401 N.W.2d 827 (1987). Here, such tactics were not used.

Thus, we hold that the trial court did not abuse its discretion or otherwise err either in excluding the evidence proffered by Lindh on cross-examination or in admitting the testimony of Dr. Roberts pertaining to his interview of Lindh on the evening of the shootings. Because of our holdings in this case, we need not consider the question of harmless error with respect to either issue.

*By the Court.*—The decision of the court of appeals is reversed.

JUSTICE WILLIAM A. BABLITCH withdrew from participation.

SHIRLEY S. ABRAHAMSON, J. (dissenting). I agree with the unanimous decision of the court of appeals that the circuit court committed prejudicial error in completely barring the defendant from cross-examining the psychiatrist-witness about a pending investigation into the witness's alleged criminal misconduct to show bias.[1]

---

[1] Cross-examination directed toward revealing biases, prejudices, or ulterior motives of a witness—that is, an interest of the witness that may relate directly to issues or personalities in the case at hand—is a particular attack on the credibility of the witness. The proper standard for the test of relevancy in cross-examination is whether the evidence will be useful to the jury in

The majority opinion holds that the test to determine whether defense counsel may cross-examine a state's witness about alleged criminal misconduct to show the witness's bias is whether a jury could find a "logical connection" between the criminal investigation of the witness and the district attorney's office on whose behalf the witness was testifying. The majority then concludes that the circuit court did not err in excluding the evidence, because "the relationship between the Dane county district attorney's office and [the witness] which would be necessary to suggest bias, interest or motive simply did not exist." Majority op. at 351.[2]

This test does not conform to the test set forth in earlier cases. This court and the United States Supreme Court have concluded that "a defendant, as an ingredient of meaningful cross-examination, must have the right to explore the *subjective* motives for the witness' testimony."[3] Evidence is relevant to the issue of bias in

appraising the credibility of the witness. *Rogers v. State,* 93 Wis. 2d 682, 689, 287 N.W.2d 774 (1980).

[2]The majority asserts that there was no evidence of any investigation of Dr. Roberts during the pendency of the defendant's case. Majority op. at 353. I believe that for the purposes of this appeal, the fact that allegations of professional misconduct by Dr. Roberts had been referred to a special prosecutor is sufficient evidence that some kind of investigation would follow.

[3]*State v. Lenarchick,* 74 Wis. 2d 425, 448, 247 N.W.2d 80 (1976) (emphasis added).

According to the United States Supreme Court, evidence relating to bias on cross-examination is relevant if a jury might reasonably find that the evidence "furnished the [state's] witness a motive for favoring the prosecution in his testimony." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

The circuit court must recognize that a jury need not accept the witness's denial about bias. Cross-examination should be permitted "to expose to the jury the facts from which jurors, as the

this case if it tends to prove that the witness believed that he might be aided or harmed by testifying in a particular way. The focus of the circuit court's inquiry should be on the witness's state of mind.

Because I believe the majority opinion uses an incorrect standard and reaches an incorrect decision, I dissent.

## I.

I believe that the circuit court in this case had to apply the following analysis to determine the relevance of evidence proffered on cross-examination to show a witness's bias: Does the proposed cross-examination support a reasonable inference that the witness believed he might benefit if he testified in favor of the state's position, or he might be disadvantaged if he testified against the state's position?

The party asserting bias need not prove that the witness received promises from the state or would in fact benefit from or be harmed by giving certain testimony. It is enough if the witness believes he or she has a self-interest in the testimony.[4]

---

sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska,* 415 U.S. 308, 318 (1974).

[4]In *Davis v. Alaska,* 415 U.S. 308 (1974), for example, the Supreme Court held that it was error to bar evidence on cross-examination that a state witness was on juvenile probation. The adverse party asserting bias in that case wished to show that the witness may have feared that his probation would be revoked and feared that he might be a suspect in the investigation. There was no suggestion that actual threats of revocation of probation had been made to the witness or that the witness was a suspect.

See also *State v. Balistreri,* 106 Wis. 2d 741, 753, 317 N.W.2d 493 (1982).

Even if the witness's beliefs were "absurd," the adverse party has a right and a duty to explore the witness's motives. We explained this obligation in *State v. Lenarchick*, 74 Wis. 2d 425, 447, 247 N.W.2d 80 (1976), as follows:

> Although no promises had been made to [the witness], he may well have been testifying favorably to the state in the hope and expectation that the state would reward him by dropping or reducing pending charges. Even though that expectation were absurd, defense counsel had the right and duty to explore the witness' motives.

I conclude that the majority opinion mistakenly adopts a new test to determine the relevance of evidence to show a witness's bias that deviates from the test this court and the United States Supreme Court have established.

## II.

Applying the test this court and the United States Supreme Court have used to determine the relevance of evidence proffered to show bias, I conclude that the circuit court erred in barring cross-examination on the issue of bias in this case.

In reviewing the circuit court's decision about the scope of cross-examination to show bias, an appellate court must consider (1) that an adverse party is allowed great latitude regarding the subject and scope of the inquiry to show bias; (2) that the determination of the relevancy of the line of questioning proffered to establish bias is within the discretion of the circuit court;[5] and (3)

---

[5]In *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981), the court stated the method for reviewing a circuit court's discretionary determination:

that it is error for a circuit court to bar an accused from presenting all facts from which a jury might reasonably infer bias of a prosecution witness.[6]

The circuit court in this case determined that the evidence proffered was "totally irrelevant and immaterial" to the issues of motive, interest or bias.[7] The state argues that on a sliding scale of possible bias, the defendant's theory of bias in this case is too weak to allow the defendant to cross-examine on this subject.

Both the majority opinion and the circuit court apparently base their determination of lack of relevance on two factors and reason as follows:

1. Dr. Roberts learned two facts simultaneously. He learned that the state might investigate allegations of

A discretionary determination, to be sustained, must demonstrably be made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law. Additionally, and most importantly, a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination. It is recognized that a trial court in an exercise of its discretion may reasonably reach a conclusion which another judge or another court may not reach, but it must be a decision which a reasonable judge or court could arrive at by the consideration of the relevant law, the facts, and a process of logical reasoning. The record here demonstrates beyond doubt that the trial court in this case failed to articulate and use the discretionary standards which the legislature has set as guidelines for determining an award of maintenance and failed to set forth the facts upon which it relied.

[6]*State v. Lenarchick,* 74 Wis. 2d 425, 446–448, 247 N.W.2d 80 (1976).

[7]The circuit court stated: "And I think it's fair to say that, no matter what [Dr. Roberts does] for the Dane County district attorney's office, [Dr. Roberts] would not be able to influence any result, as a result of [the special prosecutor's] investigation or any judge that might ultimately hear it, should there be any charges filed."

criminal conduct his patients made against him. He also learned that a special prosecutor unconnected with the Dane County district attorney's office would be in charge of the matter. Knowing that the Dane County district attorney was prosecuting the defendant in this case and another district attorney's office was in charge of a possible investigation of him for criminal charges, Dr. Roberts could not possibly think that his testimony benefitting the Dane County district attorney's case against the defendant could influence the outcome of his own potential criminal case.

2. Criminal charges were not filed against Dr. Roberts during the pendency of the defendant's case. Thus during the pendency of the defendant's case, because any prosecution of Dr. Roberts was "merely a possibility, there was no reasonable basis to believe that Dr. Roberts would color his report . . ." or testimony. Majority op. at 352. The majority intimates that no bias can be shown unless criminal charges are filed or there is proof of actual negotiation between the witness and the state regarding specific pending charges.

This reasoning is, I believe, flawed. The majority's reliance upon the special prosecutor's being in the Milwaukee County district attorney's office and not in the Dane County district attorney's office lends little support for the majority's conclusion. Even though the circuit court or the majority believes that the presence of two autonomous district attorney offices guarantees that the one would not influence the other, Dr. Roberts might have believed otherwise. Dr. Roberts would know that his testimony in this high profile case would be an open, public record that the special prosecutor might very well hear or read about.

The record shows that Dr. Roberts learned of his expanding difficulties with various authorities after his

January interview with the defendant and before he filed his report in August. He learned about investigations by the University Hospital and the State Medical Examining Board and that allegations against him had been referred to the State Justice Department and the district attorney's office. Nothing in the record indicates that Dr. Roberts had formed an opinion regarding the defendant's mental state after the first interview. Indeed, Dr. Roberts interviewed the defendant in June and again in August shortly before trial in September, 1988.

A jury could infer that Dr. Roberts may have felt intensified internal pressure over the entire period to shade his testimony in favor of the state. A jury could infer that Dr. Roberts believed, however unwarranted the belief, that if he testified favorably for the state in the defendant's case, the special prosecutor might be more favorably disposed to drop the investigation; or to investigate the allegations less vigorously; or to show leniency in any charges filed or in a plea agreement or in a recommendation on sentencing.

Neither case law nor logic supports the majority's view that formal charges must be filed before an investigation into criminal behavior is relevant to the issue of bias. The cases stand for the proposition that "when a witness is subject to the coercive power of the state and can also be the object of its leniency" an adverse party must have the opportunity to explore the subjective motives for the witness's testimony. *State v. Lenarchick,* 74 Wis. 2d 425, 447–448, 247 N.W.2d 80 (1976).[8]

---

[8]See *United States v. Garrett,* 542 F.2d 23 (6th Cir. 1976), holding it was abuse of discretion for the trial court to exclude evidence that the government's witness in a drug case had been suspended from the police force because he was suspected for using hard drugs himself and had refused to submit to a urine test. The court of appeals concluded that a jury may have inferred

That charges had not been filed against Dr. Roberts strengthens rather than weakens the defendant's theory of bias.[9] Dr. Roberts rendered his opinion on the defendant's mental capacity when he did not know what the state would do to him. The jury could reasonably infer that as long as the special prosecutor deferred action on Dr. Roberts's case, Dr. Roberts could hope—even though that hope may have been unrealistic—that he might help his own cause by testifying favorably for the state's position in the defendant's case.

In this case the range of cross-examination to show bias should be even broader than in other cases. In many areas, such as fingerprints, ballistics, and forensic chemistry, expert testimony opinions are formed from "hard" data, knowledge or principles. The opportunity for the expert opinion to be influenced by bias is limited. Psychiatry, in contrast, is a field based largely on "soft" data or knowledge. Under these circumstances the possibility increases that the psychiatrist's findings, opinions, and presentations may be slanted, consciously or unconsciously, by any biases. J. Ziskin and D. Faust, *Coping*

---

that the witness looked upon a successful prosecution as a means of having his suspension lifted.

See also *State v. Chesnut,* 621 P.2d 1228, 1233 (Utah 1980), *disapproved on other grounds, State v. Crick,* 675 P.2d 527, 531 (Utah 1983) ("the mere possibility of future criminal charges is a sufficient basis to explore the motives of the witness on cross-examination [and to] place his apprehensions thereof before the jury").

[9]The fact that the charges against Dr. Roberts were unproven might be important to the defendants' theory of admissibility based on challenging Dr. Roberts's credibility. Since I conclude that the evidence was admissible to show bias, I do not reach that issue.

*with Psychiatric and Psychological Testimony* 45 (4th ed. 1988).

I conclude that under the circumstances of this case the circuit court abused its discretion in ruling that the evidence of the criminal investigation involving Dr. Roberts was irrelevant to the defendant's theory of bias.[10]

### III.

Relevant evidence, of course, may be barred if its probative value is outweighed by unfair prejudice. The circuit court may exclude relevant evidence if it has "a tendency to influence the outcome by improper means." *State v. Baldwin,* 101 Wis. 2d 441, 455, 304 N.W.2d 742 (1981). The state argues that unproved allegations of Dr. Roberts's sexual misconduct with patients is a "highly emotionally charged" issue that would distract the jury.

Dr. Roberts's testimony was of great importance to the state. The sole issue in the second phase of the trial was the defendant's mental state. Both the state and the defendant relied on expert witnesses to prove the defendant's mental state. Dr. Roberts was the only expert witness who saw the defendant at the critical time, the day of the offense. The jury's responsibility was to "weigh the opinion of one expert against that of another . . . consider[ing] the relative qualifications and credibility of the expert witnesses." Wis JI—Criminal 200A

---

[10]Because I believe the circuit court abused its discretion in refusing to admit the evidence of bias on cross-examination, I do not reach the defendant's constitutional claim based on the confrontation clause. I note, however, that conforming to the Wisconsin Rules of Evidence may not satisfy constitutional requirements.

(Rel. No. 10—11/83).[11]

The evidence of Dr. Roberts's being an object of an investigation for criminal wrongdoing was probative of bias. Any prejudice or distraction caused by giving this information to the jury could have been circumscribed by restricting the scope of the defendant's cross-examination.[12] The nature of the allegations made by Dr. Roberts's patients was irrelevant to the defendant's theory of bias. The relevant information for the jury was the seriousness of the allegations, the referral of the allegations by the hospital to the state for possible criminal prosecution, and the effect on Dr. Roberts's professional career, livelihood, reputation and personal life should he be charged with or convicted of these charges.

Given an adverse party's great latitude regarding the subject and scope of an inquiry to show the witness's bias, the importance of Dr. Roberts's testimony, and the circuit court's power to curtail any undue prejudice to the state by limiting the cross-examination, the circuit court abused its discretion in barring all the proffered evidence, concluding that prejudice to the state outweighed the probative value of the evidence in this case.

## IV.

I further conclude that the error barring the evidence was not harmless. Dr. Roberts was the state's primary psychiatric witness. He emphasized in his testimony the value of having interviewed the defendant on the day of the shooting—an advantage the other psychi-

---

[11]The members of the jury are always the "sole judges of the credibility of the witnesses and the weight and credit to be given to their testimony." Wis JI—Criminal 300 (Rel. No. 25—6/90).

[12]The circuit court never considered limiting instructions, because the court ruled the evidence was not relevant.

atric witnesses could not claim. Despite the defendant's having the burden of proof on the mental disease or defect issue in the second half of the bifurcated trial, I conclude that prohibition of the bias evidence on cross-examination of Dr. Roberts undermines confidence in the outcome of this case. *State v. Dyess,* 124 Wis. 2d 525, 544–45, 370 N.W.2d 222 (1985).

## V.

Finally, I register my disagreement with the majority's conclusion that the *Miranda* rule does not apply to Dr. Roberts's initial interview of the defendant. The United States Supreme Court has not yet decided a case which discusses the application of *Miranda* in situations such as the one presented in this case, namely, where the interview takes place before the accused has been charged or has raised a defense of insanity.[13]

The court should not reach out and decide this issue which is not presented by the facts of the case. The court of appeals correctly determined, I believe, that Dr. Roberts's *Miranda* warnings to the defendant were adequate and that the defendant's rights were honored. Although Dr. Roberts failed to inform the defendant that a lawyer would be provided to him at state expense, if necessary, a Dane County detective gave the defendant his full *Miranda* rights less than an hour before the interview with Dr. Roberts.

---

[13]The majority's reliance on *Estelle v. Smith,* 451 U.S. 454 (1981), for its conclusion that *Miranda* does not apply to Dr. Roberts's initial interview of the defendant is misplaced. See Comment, *Fifth Amendment Limitations on the Use of Police Testimony to Rebut the Insanity Defense,* 58 U. Chi. L. Rev. 359 (1991).

For the reasons set forth, I would affirm the decision of the court of appeals. Like the court of appeals, I would remand for a new trial on the defendant's plea of not guilty by reason of mental disease or defect.